315 Ga. 741
FINAL COPY

S22A0939. SILLAH v. THE STATE.
S22A1175. MURRAY v. THE STATE.

PETERSON, Presiding Justice.

After a joint trial, Darnell Sillah and Andrew Murray were convicted of malice murder for the shooting death of Paul Sampleton, Jr., as well as various other crimes.[1] On appeal, Sillah,

---

[1] Sampleton was killed on December 19, 2012. In June 2014, a Gwinnett County grand jury indicted Sillah, Murray, and Tavaughn Saylor in a 20-count indictment charging them with: malice murder (Count 1); two counts of felony murder, predicated on armed robbery and burglary (Counts 2 and 3); armed robbery (Count 6); burglary (Count 7); false imprisonment (Count 8); aggravated assault of Stevo Hrnjak (Count 9); criminal damage to Hrnjak's property (Count 10); burglary of Joyce Morris (Count 12); conspiracy to rob Sampleton (Count 13); conspiracy to commit burglary at Sampleton's residence (Count 14); violation of the Racketeer Influenced and Corrupt Organizations (RICO) Act (Count 17); and criminal gang activity (Count 18). Sillah was separately charged with burglary of John Dugas (Count 11), while Murray and Saylor were separately charged with felony murder predicated on possession of a firearm by a convicted felon and possession of a firearm by a convicted felon (Counts 4 and 15 for Murray; Counts 5 and 16 for Saylor). Murray and Saylor also received recidivism notices (Counts 19 and 20).

After a joint trial in October 2014, the jury found all three defendants guilty as to all counts against them except Count 12. The trial court sentenced Sillah as follows: life in prison without parole on Count 1, with Counts 2 and 3 vacated by operation of law; life in prison on Count 6; 20 years in prison on Counts 7, 9, 11, and 17; ten years in prison on Counts 8, 10, 13 and 14; and 15 years in prison on Count 18. Each sentence after Count 1 was made consecutive

who was a juvenile when Sampleton was killed, argues that (1) the evidence was insufficient to support his conviction for criminal gang activity; (2) the trial court erred by admitting his custodial statement; (3) the trial court erred by denying his motion to sever; (4) the trial court failed to consider Sillah's "youth and attendant characteristics" before sentencing him to life in prison without the possibility of parole ("LWOP"); (5) this sentence violated the Eighth

---

to all preceding counts, making Sillah's total sentence life without parole, followed by life, followed by 135 years. Murray and Saylor were sentenced to life without parole on Count 1, life in prison for Count 6; 20 years in prison on Counts 7, 9, and 17; ten years for Counts 8, 10, 13 and 14; five years for the firearm possession count; and 15 years for Count 18. The felony murder counts were vacated by operation of law, and all counts were to run consecutively, giving Murray and Saylor total sentences of life without parole, followed by life, followed by 120 years.

Sillah filed a motion for new trial in October 2014, which he subsequently amended, and that amended motion was denied on March 14, 2022. Sillah timely appealed, and his case was docketed to the August 2022 term of this Court and submitted for a decision on the briefs.

Murray also filed a motion for new trial in October 2014 and then engaged in a series of dilatory tactics, leading the trial court to reject his motion without addressing the merits. See *Murray v. State*, 312 Ga. 863, 864-868 (1) (866 SE2d 385) (2021). We vacated the order and remanded the case for the trial court to consider the merits of Murray's motion for new trial. Id. at 870 (3). Upon remand, the trial court denied Murray's motion for new trial. Murray appealed, his case was docketed to this Court's August 2022 term, and the case was submitted for a decision on the briefs.

Saylor has also appealed from his convictions, but his appeal, which was docketed to the term beginning in December 2022, will be considered separately.

Amendment of the United States Constitution; and (6) the trial court committed other sentencing errors. We agree with Sillah that the trial court should have merged his convictions for conspiracy to commit armed robbery and conspiracy to commit burglary, so we vacate those convictions. We otherwise affirm.

Murray, proceeding pro se on appeal, appears to argue that the trial court failed to consider the merits of his motion for new trial and that the State failed to present evidence of guilt at the motion for new trial hearing. The record belies Murray's first claim, and the State had no burden of proof at the hearing, negating the second claim. So we affirm.

Viewed in the light most favorable to the verdicts, the trial evidence showed the following. Sillah, known as "Young," was a member and leader of the Young Wavy Goons ("YWG"), a gang affiliated with the Bloods gang and whose members were mostly high school students. The gang committed several robberies, burglaries, and car thefts.

In September 2012, Sillah and fellow YWG member Romaine

3

Stewart broke into the house of John Dugas, whose son attended high school with Sillah and Stewart. Sillah and Stewart stole electronics and several firearms from Dugas, including a .45-caliber Sig Sauer.

In December 2012, Sillah was 15 years old and was living with his grandmother and co-defendants Andrew Murray, who is his uncle, and Tavaughn Saylor, who had relocated to Georgia from New York with Murray. Murray was a gang member affiliated with the Bloods street gang. In late November or early December, Sillah and fellow YWG gang members Stewart and Achiel Morgan discussed robbing Sampleton, a high school classmate, and taking shoes from him. Sampleton had a collection of high-priced sneakers that he would sometimes trade or sell. Murray sent Sillah text messages in mid-December asking "what time son got off the bus?" and "Do son have football practice?" Sampleton was on his high school football team.

On December 17, Stewart, Morgan, and Sillah were heading home on the school bus when they decided to carry out their plan to

4

rob Sampleton after Stewart gave Sampleton a haircut. After Stewart finished cutting Sampleton's hair, he and Sampleton walked to Sampleton's house so that Stewart could get paid. As they got close to Sampleton's neighborhood, Sillah, who had called Stewart repeatedly for updates, told Stewart, "you're supposed to let him walk by hisself [sic] . . . you're messing up the move, you're messing it up[.]" Meanwhile, Murray's car drove by. Stewart, Sillah, and Morgan did not carry out the robbery that day.

Two days later, Sampleton had an early release from school. Sampleton's mother began calling her son at home around 11:45 a.m. to check on him, but when he did not answer after numerous calls, she asked his father to go to her residence in Grayson to check on Sampleton. Sampleton's father, who arrived at the house around 1:45 p.m., found Sampleton face-down on the kitchen floor, with duct tape over his mouth and his hands bound behind his back. Sampleton was dead and had been shot three times in the head with a .45-caliber gun, possibly a Sig Sauer. A mail carrier in Sampleton's area testified that she heard three gunshots between 12:45 p.m. and

1:15 p.m.

Sampleton was shoeless, the house and garage had been ransacked, and "Home Rep 5CK" was written on a bathroom mirror. A gang expert testified that "Rep 5" signified that the perpetrator was representing "People Nation," which was comprised of several gangs including the Bloods gang, and that "CK" stood for "Crip Killer." Electronics, Sampleton's Billionaire Boys Club sweatshirt, several pairs of his Nike shoes, other clothing, and a bottle of liquor were missing.

Around 2:30 p.m. on the day of Sampleton's death someone fired a gun at Stevo Hrnjak while he was driving south on Interstate 85. Hrnjak stated that he and a silver BMW had been traveling for some time before they both got off at the same exit in Norcross, and when he tried to pass the BMW following a turn, a man in the BMW pulled out a gun and fired two shots at him. Hrnjak said there were at least two men riding in the front of the car but could not tell if there was a passenger in the rear because of the vehicle's dark-tinted windows. After speaking to police, Hrnjak went searching for

the silver BMW, finding it at an apartment complex where Anthony English lived.

English frequently bought goods from Murray and re-sold them. English testified that Murray, Sillah, and a man he did not recognize came to his apartment on December 19. They arrived in a silver BMW and Sillah and Murray were carrying handguns. Murray asked if English could sell some items for him. English sold many of the items that were stolen from the Sampleton residence, but he kept the Billionaire Boys Club sweatshirt for himself. Sillah also sold some of the stolen electronics himself and tried to sell a .45-caliber gun.

The defendants were ultimately arrested. At the time of their arrest, Sillah and Saylor were in a silver BMW that matched the description given by Hrnjak. Sillah was interviewed by the police and a recording of the interview was played at trial. He admitted that he and Stewart discussed robbing Sampleton, but denied participating in the crime. Sillah claimed that on the day of Sampleton's murder, Murray and Saylor picked him up from school

and took him back to his neighborhood in a silver BMW. Sillah said he got out of the car just outside his neighborhood and went to meet "Samantha," but Sillah refused to provide any other identifying information because he claimed "Samantha" would allege that he raped her. He said the two of them traveled in her car, which he could not describe other than as "brown," to a park, where he smoked marijuana and they had sex. Cell phone records contradicted Sillah's account of where he claimed to have been.

Timothy Johnson, who was an inmate with Sillah, testified at trial that Sillah admitted to participating in Sampleton's killing. Sillah told Johnson that he, Murray, and Saylor entered Sampleton's home, Saylor tied up Sampleton, and Murray shot Sampleton. Sillah said that he went "back and forth from searching the home to checking the front of the home, being more of a lookout." Sillah told Johnson that Murray "didn't have to shoot [Sampleton] in the head." Sillah asked Johnson whether he could still be found guilty of murder even if it could not be proven that he was in Sampleton's house.

8

1. Sillah argues that the evidence was insufficient to support his conviction for criminal street gang activity. We disagree.

When evaluating the sufficiency of evidence, the proper standard of review is whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). We do not resolve conflicts in the evidence or determine the credibility of witnesses; instead, we view the evidence in the "light most favorable to the verdict, with deference to the jury's assessment of the weight and credibility of the evidence." *Hayes v. State*, 292 Ga. 506, 506 (739 SE2d 313) (2013) (citation and punctuation omitted). The jury's resolution of these issues "adversely to the defendant does not render the evidence insufficient." *Graham v. State*, 301 Ga. 675, 677 (1) (804 SE2d 113) (2017) (citation and punctuation omitted).

Sillah was charged with violating the Street Gang Act on the basis that, while associated with a criminal street gang, he participated in criminal gang activity through the commission of at

9

least one of several crimes, including murder, felony murder, armed robbery, and burglary. To convict Sillah, the State had to prove beyond a reasonable doubt the existence of a "criminal street gang," that Sillah was associated with the gang, that he committed one of the offenses listed in OCGA § 16-15-3 (1), and that the commission of the predicate offense was intended to further the interests of the gang. See *McGruder v. State*, 303 Ga. 588, 591-592 (II) (814 SE2d 293) (2018). A "criminal street gang" is defined as "any organization, association, or group of three or more persons associated in fact, whether formal or informal, which engages in criminal gang activity[.]" OCGA § 16-15-3 (3).

Sillah does not argue that the evidence was insufficient to show that he committed one of the enumerated offenses. Nor does he argue that the evidence failed to show the existence of a criminal street gang or that he was associated with it. Indeed, the evidence set forth above was sufficient to establish these elements. Instead, Sillah argues that the evidence was insufficient to show that the predicate acts furthered the interest of a particular gang when the

10

evidence did not show that the defendants were in the same gang or that the defendants had a common interest.

A criminal street gang expert testified that YWG, the gang of which Sillah was the leader, was a subset of the United Blood Nation, otherwise known as the "Bloods." There was also evidence showing that YWG had committed several felonies, and that criminal street gangs generally committed such crimes in order to obtain money and to gain status or reputation. Although there was no evidence that Murray or Saylor was in YWG, the evidence did show that Murray was a member of a Bloods gang, and there was evidence that the crimes enhanced the Bloods gang's status when gang graffiti representing the Bloods gang — "Home Rep 5CK" — was left at the scene of the crime. Although Sillah argues that there was no evidence introduced that he was aware of the graffiti, the jury was authorized to conclude otherwise based on evidence that, at a minimum, Sillah helped ransack the house. This evidence was sufficient to support Sillah's conviction. See *Hayes v. State*, 298 Ga. 339, 342-343 (a) (781 SE2d 777) (2016) (defendant's association with

a gang and his participation in the gang's activities before and during the crimes charged provide the required nexus between his criminal acts and the intent to further the gang's interests to obtain money, power and respect); *Morey v. State*, 312 Ga. App. 678, 686-687 (2) (b) (719 SE2d 504) (2011) (affirming conviction under OCGA § 16-15-4 where there was testimony that defendant was "repping his gang" while committing crimes).

2. Sillah argues that the trial court erred in admitting his custodial statement because, during his interview, he invoked his right to remain silent by repeatedly saying he did not want to talk to the detective and that his right was not honored. We disagree.

A video recording of the interview shows that Sillah was interviewed by Sergeant Atwater of the Gwinnett County Police Department. Early in the interview, Sillah said he did not want to talk without his grandmother present. Sergeant Atwater responded that he would read Sillah certain warnings anyway and then Sillah could decide what he wanted to do. After receiving *Miranda* warnings tailored to juvenile defendants, Sillah declined to sign a

12

waiver form and said he would not talk until his grandmother arrived. More than an hour later, Sillah's grandmother arrived at the police station, was brought into the interview room, and talked privately with Sillah, with certain files being left on the table. When Sergeant Atwater returned to the room, he explained that he left the files on the table so Sillah's grandmother could understand Sillah's involvement in criminal activity. Sergeant Atwater told Sillah that he wanted answers, leading to an argument about whether Sillah said he would cooperate. Sillah maintained that he never agreed to provide information to the police, and said he was not personally involved, "that's all I'm going to tell y'all," and "that's the only thing I can really say" before explaining that he might know some things in general.

Sergeant Atwater said that he would not mind knowing what Sillah "knew in general" and explained that it was in Sillah's interest to talk since he knew Sillah had information about Sampleton's murder. Sergeant Atwater asked Sillah if he wanted to talk, and Sillah responded, "I ain't got nothing to say." Sillah

repeated that he did not do anything and had nothing to say. After a brief pause, Sillah said he did not have anything to say because he did not know anything, then asked what Sergeant Atwater wanted Sillah to tell him. Sergeant Atwater replied that he wanted Sillah to say everything he knew and told Sillah that he should worry about himself when Sillah said he did not want to tell on anyone. Sillah questioned how Sergeant Atwater knew he had information about Sampleton's death, challenged aspects of Sergeant Atwater's information, suggested that he look at other suspects like Murray, and again denied participating in any murder. Sillah then said, "I don't want to talk no more." After indicating his disappointment with Sillah, Sergeant Atwater left the room.

Sergeant Atwater reentered the room sometime later, and Sillah's grandmother began to engage with Sergeant Atwater. Sergeant Atwater refused to talk to her about the case in Sillah's presence on the basis that Sillah said he did not want to talk. Sergeant Atwater informed Sillah that he would not be going home and was going to be charged with murder. Sergeant Atwater exited

14

again, leaving Sillah and his grandmother in the room.

While Sergeant Atwater was out of the room, Sillah's grandmother asked Sillah several times to tell police anything he knew, left the room repeatedly, and then relayed to Sillah information she was learning from the police. When Sillah heard that Stewart was providing information to the police, Sillah said he wanted Stewart to sit in front of him so he could confirm what Stewart had reported. Sergeant Atwater brought Stewart into the room and told Sillah to be quiet while Stewart was talking. Sergeant Atwater recounted what Stewart told him when Stewart began to equivocate, and Stewart ultimately confirmed Sergeant Atwater's report. Stewart left the room and Morgan was brought in next. When Morgan began to say what he told police, Sillah challenged him, prompting Sergeant Atwater to yell at Sillah at length, telling him to "be quiet." When Sergeant Atwater finished yelling, Sillah briefly attempted to tell a version of what happened. Morgan and Sergeant Atwater then left the room.

Sillah and his grandmother spoke for a few minutes before

15

Sillah asked his grandmother to "tell the man to come back in." Sergeant Atwater came back in and asked Sillah if he wanted to talk. Sillah indicated that he did and signed a waiver form after again receiving *Miranda* warnings.

On appeal, Sillah argues that he made several assertions of his right to remain silent in the above exchange and that his invocation was not scrupulously honored. His claim fails.

> The law is clear that, when a person in the custody of law enforcement officers unambiguously and unequivocally invokes his right to remain silent in connection with their interrogation, the interrogation must cease immediately. Whether an invocation is unambiguous and unequivocal depends on whether the accused articulated a desire to cut off questioning with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be an assertion of the right to remain silent.

*Davidson v. State*, 304 Ga. 460, 468-469 (4) (819 SE2d 452) (2018) (citations and punctuation omitted). If a defendant invokes his right to remain silent, his subsequent statements are admissible only if he "initiates the communications with law enforcement authorities," which requires "not only that the defendant speak up first but also

16

that his words reflect a desire to discuss the investigation at hand." *State v. Pauldo*, 309 Ga. 130, 135 (2) (844 SE2d 829) (2020) (citations and punctuation omitted).

Despite Sillah's claims that he made repeated assertions of his right to remain silent, he does not identify precisely in his brief what statements constituted assertions of his right to remain silent. Nevertheless, our review of the recording shows that out of several possible statements indicating a desire to stop speaking, only one statement — "I don't want to talk no more" — was an unambiguous invocation of his right to remain silent. But as explained further below, Sillah later re-initiated communications with the police.

Sillah's statement that he would not speak to the police until his grandmother was present was not an unequivocal statement that he did not want to talk at all. When the grandmother did arrive, Sillah denied personal involvement and again indicated that he did not want to talk by saying that "that's all I'm going to tell y'all" and "that's the only thing I can really say." But these statements were not unequivocal assertions of the right to remain silent because,

17

after making these statements, he continued to speak unprompted, saying that he might know some things in general. See *Goodman v. State*, 313 Ga. 762, 769 (2) (b) (873 SE2d 150) (2022) (defendant's statements that he did not want to talk were not unambiguous assertions of right to remain silent because context showed that, despite his statements, the defendant continued talking without any prompting from the police).

After Sillah said he might know some things in general, Sergeant Atwater responded that he would like to know those things and that it was in Sillah's interest to talk. Although Sillah repeated that he had nothing to say, he also asked what Sergeant Atwater wanted him to say, asked how Sergeant Atwater knew Sillah had information about the murder, and then challenged that information. These statements also do not reflect an unambiguous assertion of the right to remain silent. See *Pauldo*, 309 Ga. at 143-144 (5) (defendant's "continued efforts to discuss the case made it unclear whether he wished to talk to the detective or not").

Until this point, Sillah had not made an unequivocal assertion

18

of his right to remain silent. But he did so when he clearly said, "I don't want to talk no more," after Sergeant Atwater advised Sillah not to worry about telling on others and that he should reveal everything he knew. At this point, Sergeant Atwater expressed his disappointment in Sillah and left the room, honoring Sillah's right. Although Sergeant Atwater returned to the room a few times thereafter, he continued to honor Sillah's right to remain silent, declining to engage with Sillah's grandmother in Sillah's presence. When Sergeant Atwater was in the room with Stewart and Morgan, who were brought in at Sillah's request, Sergeant Atwater told Sillah to be quiet, and even yelled at him to do so, but he did not ask Sillah any questions. Thereafter, Sillah clearly initiated contact with the police by asking his grandmother to have Sergeant Atwater return to the room so they could speak, at which time Sillah was read *Miranda* warnings for a second time and signed the waiver form. Sillah makes no claim that his waiver was not knowingly, intelligently, or voluntarily made. Therefore, the trial court did not err in admitting his custodial statements.

3. Sillah argues that the trial court erred in denying his motion to sever his trial. We disagree.

When two or more defendants are jointly indicted for a capital offense where the State does not seek the death penalty, "such defendants may be tried jointly or separately in the discretion of the trial court." OCGA § 17-8-4 (a). A trial court has broad discretion to grant or deny a motion to sever in such cases, and when ruling on such a motion, a court should consider: "(1) the likelihood of confusion of the evidence and law; (2) the possibility that evidence against one defendant may be considered against the other defendant; and (3) the presence or absence of antagonistic defenses." *Herbert v. State*, 288 Ga. 843, 845 (2) (708 SE2d 260) (2011).

When claiming on appeal that a trial court abused its discretion in denying a severance motion, a defendant must do more than show the "presence of antagonistic defenses or possibility that a separate trial would give a defendant a better chance of acquittal." *Smith v. State*, 308 Ga. 81, 85 (2) (839 SE2d 630) (2020) (citation and punctuation omitted). The defendant must make a clear showing

that the joint trial was "so prejudicial as to amount to a denial of his right to due process." *Palmer v. State*, 303 Ga. 810, 814-815 (III) (814 SE2d 718) (2018) (citation and punctuation omitted).

Here, Sillah was tried only with Murray and Saylor, they were tried for almost the same offenses relating to the same incident, the law and evidence were substantially the same for all of them, and the State argued that they acted in concert in committing the crimes. Despite these circumstances, Sillah attempts to show prejudice by arguing that the evidence of Murray's membership in a Bloods gang would have been considered against him. But this evidence would have been admissible even if his severance motion had been granted, because the State's theory underlying the criminal street gang count was that Sillah and Murray acted in concert with each other, as gang members, to commit the crimes. See *Nicholson v. State*, 307 Ga. 466, 474 (4) (837 SE2d 362) (2019) (defendant pointed to no evidence admitted at joint trial with the co-defendant "that would not have been admitted had his severance motion been granted, because the State's evidence was that they

21

acted in concert with each other and other gang members to commit the crimes").

Sillah next argues that evidence that Murray and Saylor were convicted felons prejudiced him, but Murray and Saylor stipulated to their status as convicted felons. Records of their convictions were admitted into evidence, but the documents did not go out with the jury and no details about the underlying crimes were disclosed at trial. Accordingly, Sillah was not prejudiced by being tried with convicted felons. See *Guffie v. State*, 304 Ga. 352, 355 (3) (818 SE2d 608) (2018) (no abuse of discretion in denial of motion to sever where co-defendant stipulated to his prior conviction and, therefore, jury did not hear any details about that crime).

Sillah finally argues that the "inartful" cross-examination of a particular witness by Murray, who initially proceeded pro se but then agreed to allow a lawyer to represent him for the remainder of the trial, was highly prejudicial. But Sillah points to no specific testimony that was elicited or explains how such testimony was damaging to his case. See *Suggs v. State*, 310 Ga. 762, 767 (5) (854

22

SE2d 674) (2021) ("It is well established that the burden is on the party alleging error to show it by the record." (citation and punctuation omitted)). This speculative argument falls short of the clear showing necessary to establish that the trial court erred in denying his motion to sever. His claim therefore fails.

4. Sillah argues that the trial court did not adequately consider his "youth and attendant circumstances" before sentencing him to LWOP on the malice murder count. Sillah argues that because no evidence about his history, prior behavior, or attendant circumstances was presented at sentencing, the trial court could not have taken such factors into account. But there is no affirmative evidence that the trial court misapplied the law in imposing an LWOP sentence on a juvenile offender, and his claim cannot prevail in the absence of such evidence.

With Sillah's consent, sentencing took place immediately after the verdict was returned. Sampleton's father observed that Sillah lacked a father figure. Sillah's mother said that Sillah was innocent. Murray said that he wanted Sillah, his nephew, to go to college and

23

that he beat Sillah up when he found Sillah was smoking marijuana and getting into trouble. Sillah's counsel argued that "given [Sillah's] age and what was alleged to be his involvement," he should be sentenced to "something less than life without parole." Sillah maintained his innocence, saying he had plenty of shoes and did not need to rob Sampleton for a pair. Sillah admitted to having "a little crew" and had some handshakes that looked similar to gang signs. He stated that he "wasn't but 15," although he also acknowledged that he was a "different type of breed of 15-year-old" and may have committed other crimes. But he maintained that he would not have killed someone over a pair of shoes.

Sillah argues that, given this limited presentation to the court, the trial court could not have adequately considered his "youth and attendant circumstances" as required by United States Supreme Court precedent. But there is no evidence the trial court ignored or misapplied the law in imposing the LWOP sentence.

By the time of Sillah's sentencing in 2014, the United States Supreme Court had struck down mandatory LWOP sentences for

juvenile homicide offenders as unconstitutional under the Eighth Amendment to the United States Constitution. See *Miller v. Alabama*, 567 U.S. 460 (132 SCt 2455, 183 LE2d 407) (2012). That Court reasoned that mandatory LWOP sentences made irrelevant "youth (and all that accompanies it)" and "preclude[d] a sentencer from taking account of an offender's age and the wealth of characteristics and circumstances attendant to it," as well as the "circumstances of the homicide offense, including the extent of his participation in the conduct," thereby "pos[ing] too great a risk of disproportionate punishment." Id. at 476-479. The Court made clear that it was not ruling that the Eighth Amendment categorically barred LWOP sentences for juvenile defendants, and that its decision "mandate[d] only that a sentencer follow a certain process — considering an offender's youth and attendant characteristics — before imposing a particular penalty." Id. at 483; see also id. at 479.

After Sillah's sentencing, the United States Supreme Court held in *Montgomery v. Louisiana*, 577 U.S. 190 (136 SCt 718, 193 LE2d 599) (2016), that *Miller* was a substantive rule of

constitutional law that must be given retroactive effect in state collateral review proceedings. See id. at 212. In concluding that *Miller* must be applied retroactively, the Court reasoned that although *Miller* had a procedural component (a hearing), it also had a substantive one and noted that the hearing requirement "gives effect to *Miller*'s substantive holding that [LWOP] is an excessive sentence for children whose crimes reflect transient immaturity." Id. at 208-210.

Based on statements in *Miller* and *Montgomery* that LWOP sentences are not permitted for the "vast majority of juvenile offenders" and are allowed only for the "rarest of juvenile offenders whose crimes reflect permanent incorrigibility," this Court concluded that a sentencing court must do more than simply consider generally a juvenile offender's "youth and attendant characteristics"; it also had to make a "distinct determination on the record" that the juvenile offender is "irreparably corrupt or permanently incorrigible[.]" *Veal v. State*, 298 Ga. 691, 702-703 (5) (d) (784 SE2d 403) (2016) (citation, punctuation and emphasis

omitted).

But the United States Supreme Court's subsequent decision in *Jones v. Mississippi*, ___ U.S. ___ (141 SCt 1307, 209 LE2d 390) (2021), clarified that such an explicit factual finding of permanent incorrigibility is not required before imposing a discretionary LWOP sentence and that a sentencing court also need not explain its reasons for imposing an LWOP sentence. *Jones* concluded that both *Miller* and *Montgomery* "squarely rejected" a formal fact finding requirement, and explained that youth was akin to a mitigating circumstance and that sentencing courts have "wide discretion in determining the weight to" give relevant mitigating evidence without having to make particular factual findings about those mitigating circumstances. 141 SCt at 1314-1316 (citation and punctuation omitted). The Court also explained that an on-the-record explanation is not necessary to ensure that a sentencing court considers a defendant's youth, because if that court has discretion to consider youth in imposing a sentence, it "necessarily *will* consider the defendant's youth, especially if defense counsel advances an

27

argument based on the defendant's youth." Id. at 1319 (emphasis in original); see also *Holmes v. State*, 311 Ga. 698, 705 (3) (859 SE2d 475) (2021) ("Therefore, to the extent that *Veal* suggested a requirement that sentencers provide explicit, on-the-record explanations regarding determinations of permanent incorrigibility and the characteristics of children, *Jones* has explained that we were mistaken.").

In this framework, Sillah's claim cannot succeed. Sillah argues that because of the limited presentation of evidence at sentencing, the trial court could not have adequately considered his youth and attendant circumstances. There is no evidence that the trial court was unaware it had the discretion not to impose an LWOP sentence. And Sillah's youth was made plain throughout the entirety of his trial. His youth was also cited at sentencing — both by Sillah directly and through counsel — as a reason for imposing something less than an LWOP sentence. As *Jones* explains, these arguments made it "all but impossible for a sentencer to avoid considering" youth. 141 SCt at 1319.

28

Sillah argues that the trial court "received the bare minimum of evidence" of his circumstances. It is true that there was limited discussion at the sentencing hearing about Sillah's background, but his complaint that not enough mitigating evidence was submitted about his background cannot be blamed on the trial court. There is no indication that the trial court limited Sillah from presenting mitigating evidence, and Sillah points to nothing in the record to suggest the court did. By arguing that the court "should look at . . . attendant characteristics," Sillah suggests the trial court was required to do more than it did, but he points to no precedent imposing an affirmative duty on the trial court to, on its own, seek out and review mitigating evidence before exercising its discretion. Nor does he cite any authority requiring a court to receive a certain quantum of evidence or spend a certain amount of time reflecting upon that evidence before imposing a discretionary LWOP sentence. Under *Jones*, "[u]nless the record affirmatively reflects otherwise, the trial court will be deemed to have considered the relevant criteria, such as mitigating circumstances, enumerated in the

sentencing rules." 141 SCt at 1321 (citation and punctuation omitted). There is no evidence that the trial court failed to understand its discretion or failed to consider the evidence presented to it. Therefore, Sillah's claim fails.

5. Sillah next argues that his total sentence violates the Eighth Amendment's ban on cruel and unusual punishments. First, Sillah argues that he is not within the category of offenders for whom an LWOP sentence is appropriate, pointing to a psychiatric evaluation that concluded that Sillah was not permanently incorrigible. Second, Sillah argues that his total sentence is constitutionally disproportionate based on his level of participation in the crimes. We disagree.

(a) As to whether the LWOP sentence was appropriate in this case, the psychiatric evaluation that Sillah points to was completed after Sillah's sentencing and was authorized by the motion-for-new-trial judge as part of his motion for new trial.[2] Although such an

---

[2] The judge who considered the motion for new trial was not the same judge who presided over the trial.

evaluation may have proved helpful to a trial court in considering the appropriate sentence, Sillah did not present such evidence at his sentencing hearing. In any case, such a report would not have been dispositive; it was the trial court's responsibility, not a psychiatrist's, to determine the appropriate sentence, based not just on Sillah's background, but also on the seriousness of the offense. See *State v. Riggs*, 301 Ga. 63, 68-69 (2) (a) (799 SE2d 770) (2017) (explaining that it is for the trial courts to exercise the discretion to "fashion sentences that fit the crimes for which the defendant is convicted, so long as the sentences fall within the statutory ranges"). As discussed below, Sillah has failed to show that his sentence was cruel and unusual.

(b) The Eighth Amendment of the United States Constitution bans "cruel and unusual punishments," including those that are grossly disproportionate to the crime committed. See *Bradshaw v. State*, 284 Ga. 675, 676-677 (2) (671 SE2d 485) (2008); see also *Ewing v. California*, 538 U.S. 11, 20 (123 SCt 1179, 155 LE2d 108) (2003) (the Eighth Amendment "contains a narrow proportionality

principle that applies to noncapital sentences" (citation and punctuation omitted)). To determine whether a sentence is grossly disproportionate, a court first compares "the gravity of the offense and the severity of the sentence." *Adams v. State*, 288 Ga. 695, 701 (4) (707 SE2d 359) (2011) (citation and punctuation omitted). When evaluating the "gravity of the offense" as part of the threshold comparison, courts look not only at the statutory elements of the offense, but also the particular circumstances of the crime committed as shown by the record. See *Conley v. Pate*, 305 Ga. 333, 336 (3) (825 SE2d 135) (2019). Moreover, "courts must defer to the legislature in determinations of sentencing parameters unless a sentence is so overly severe or excessive in proportion to the offense as to shock the conscience." *Winslow v. State*, 315 Ga. 133, 143 (3) (880 SE2d 530) (2022) (citation and punctuation omitted).

In the rare case that this threshold comparison "leads to an inference of gross disproportionality," a court next compares "the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the

same crime in other jurisdictions." *Conley*, 305 Ga. at 336 (3) (citation and punctuation omitted). "[I]t is the rare case in which the threshold inference of gross disproportionality will be met and a rarer case still in which that threshold inference stands after further scrutiny." *Adams*, 288 Ga. at 701 (4) (cleaned up); see also *United States v. Smith*, 967 F3d 1196, 1214 (11th Cir. 2020) ("Outside the context of capital punishment, successful challenges to the proportionality of sentences are rare.").

Here, comparing the gravity of Sillah's offenses with the severity of his sentence does not even raise an inference of gross disproportionality. There is no doubt that Sillah's sentence is severe, but his total sentence reflected the seriousness of his crimes. Sillah was convicted of murder and other major felonies, including for conduct that reflected his participation in ongoing criminal gang activity. The bulk of Sillah's total sentence came from his convictions related to that killing, Sillah having received the LWOP sentence for the malice murder of Sampleton and a consecutive life sentence for the armed robbery of Sampleton.

Sillah argues that the sentences were grossly disproportionate to the gravity of his offenses for a number of reasons, primarily that he did not intend for Sampleton to be killed and that he was not a direct participant in the crime. He argues that, although he conspired to rob Sampleton, his plan was simply to push Sampleton down and take what he had, and that it was Murray's plan to burglarize Sampleton's home. In support of his argument, Sillah relies on testimony by a fellow inmate of Saylor regarding statements that Saylor allegedly made to the inmate about the planning of the robbery of Sampleton. But in citing this testimony, Sillah does not mention that Saylor also allegedly said that Sillah offered Sampleton as a possible target when Murray said they wanted to break into someone's house in order to make money to return to New York. Even if armed robbery was not Sillah's original plan, he helped Murray and Saylor target Sampleton and participated in the more dangerous plan.

Sillah next argues that the sentence was grossly disproportionate because the evidence shows that he merely acted

as a lookout during the robbery and there was "scant evidence" that he was even in the house at the time of the murder. But even Sillah's own statements show that he was more than merely a lookout. Timothy Johnson testified that Sillah confessed that he, Murray, and Saylor entered Sampleton's home and that the other co-defendants tied up and shot Sampleton. Sillah also said that he went "back and forth from searching the home to checking the front of the home." Although the evidence does not show that Sillah shot and killed Sampleton, the record supports the conclusion that Sillah was an active participant in planning the crime and covering it up.

Sillah next argues that he did not intend for Sampleton to be killed, pointing to his statement to a fellow inmate that Murray did not have to shoot Sampleton. Sillah argues in his brief that this showed his remorse. Sillah did not make these arguments to the trial court during sentencing, but even if he did, the trial court would have been authorized to reject that statement as showing remorse when Sillah insisted at sentencing that he was innocent and failed to make any statement accepting responsibility for his actions. See

*Height v. State*, 278 Ga. 592, 595 (1) (604 SE2d 796) (2004) (in considering mitigating evidence, trial court must exercise its discretion to determine whether the evidence is sufficiently reliable to be admitted).

Sampleton's tragic death was not the only offense at issue. After leaving Sampleton's house, Sillah or one of his co-defendants shot at another motorist. And Sillah committed at least one other robbery, taking several firearms in the process and reselling some of them. Therefore, despite Sillah's young age, his sentences do not meet the threshold inference of gross disproportionality given the number and severity of the offenses at issue, in particular the shooting of Sampleton. Therefore, Sillah's claim fails.

6. Sillah next argues that the trial court erred in sentencing him for conspiracy to commit armed robbery (Count 13) and conspiracy to commit burglary (Count 14) when he was also sentenced on the completed offenses (Counts 6 and 7, respectively). He argues that the conspiracy counts were lesser-included offenses because the offenses involved the same victim and same co-

conspirators. We agree.

Under Georgia law, "[a] person commits the offense of conspiracy to commit a crime when he together with one or more persons conspires to commit any crime and any one or more of such persons does any overt act to effect the object of the conspiracy." OCGA § 16-4-8. A conspiracy count "is merged into the greater crime where the evidence shows without dispute that the crime charged was actually committed, or that all of the essential acts constituting the crime were committed." *Crosby v. State*, 232 Ga. 599, 602 (3) (207 SE2d 515) (1974).

Here, the conspiracy counts charged that, on or about December 17, 2012, Sillah conspired with Murray and Saylor to rob (Count 13) and burglarize (Count 14) Sampleton. There is no dispute that the burglary or robbery was not carried out on December 17, but those offenses were completed two days later, as reflected by his convictions in Counts 6 and 7.

The State argues that because the December 17 agreement was not carried out that day, the conspiracy counts were separate

offenses not subject to merger. In support, the State relies on *Roberts v. State*, 242 Ga. 634 (250 SE2d 482) (1978), wherein this Court stated that a conspiracy is "a separate crime only in cases where the crime conspired to be committed had not in fact been committed, that is, where the conspiracy had been, so to speak, 'nipped in the bud.'" Id. at 635 (2) (citation and punctuation omitted).

Contrary to the State's argument, the conspiracy was not "nipped in the bud." A new conspiracy did not arise simply because the object of the conspiracy — to rob and burglarize Sampleton — was not carried out on December 17. See *Waldrip v. State*, 267 Ga. 739, 747 (10) (b) (482 SE2d 299) (1997) ("[T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing separate parts but by looking at it as a whole. Thus, even if one conspirator acts separately from the others to achieve a common goal, his acts will be imputed to the others, without a new agreement directed to that particular act."), abrogated in part on other grounds as recognized in *Booth v. State*, 301 Ga. 678, 681 (2) (804 SE2d 104) (2017). Because the December 17 conspiracy continued through the

completion of the substantive offenses,[3] the conspiracy counts — Counts 13 and 14 — should have merged with the completed offenses — Counts 6 and 7, respectively. We therefore vacate the sentences on Counts 13 and 14.[4]

7. Sillah also argues that, under OCGA § 16-1-7 (a), the trial court erred in entering a sentence on Count 17, which charged a violation of the RICO Act, based on several predicate acts for which he was separately convicted in this case. Sillah's claim fails.

OCGA § 16-1-7 (a) provides:

> When the same conduct of an accused may establish the commission of more than one crime, the accused may be prosecuted for each crime. He may not, however, be convicted of more than one crime if:
> (1) One crime is included in the other; or
> (2) The crimes differ only in that one is defined to prohibit a designated kind of conduct generally and the other to prohibit a specific instance of such

---

[3] The exact date Sillah, Murray, and Saylor formed the conspiracy is not clear from the record, but the record shows Murray and Sillah exchanging texts a few days before December 17 that would support a conclusion that there was an agreement between these individuals to rob Sampleton at least by December 17. In any case, there is no evidence that there were two separate conspiracies between Sillah, Murray, and Saylor; instead, the evidence supports the conclusion that there was one continuing agreement that culminated in Sampleton's death.

[4] Because the trial court's sentence was proper in all other respects, we need not remand for resentencing. See *Booth*, 301 Ga. at 688 (5).

39

conduct.

Sillah argues that the RICO conviction was barred because it was included in another crime, but he relies on cases applying the "actual evidence" test that we have overruled. See *Johnson v. State*, 313 Ga. 155, 158 (3) (868 SE2d 226) (2022) (noting that actual-evidence test has been long-overruled). He makes no argument that applying the correct test — the "required evidence" test — compels merger. Even so, Sillah has not shown that the RICO count was included in any of the other charged offenses.

By its terms, OCGA § 16-1-7 (a) (1) applies only when the "same conduct" is at issue. See *Johnson*, 313 Ga. at 157 (3) ("Substantive double jeopardy law protects a defendant from multiple punishments when his crimes arise from the *same conduct*." (citing OCGA § 16-1-7 (a) (1); emphasis added)). Typically, the "same conduct" refers to acts committed against the same victim at the same time. If crimes are committed against different victims or are separated by some time interval, they do not merge. See, e.g., *Jones v. State*, 290 Ga. 670, 672 (2) (725 SE2d 236) (2012) (providing that

the merger doctrine under OCGA § 16-1-7 (a) "does not apply if each of the charged crimes was committed against a different victim" (citation and punctuation omitted)); *Culpepper v. State*, 289 Ga. 736, 738-739 (2) (a) (715 SE2d 155) (2011) (concluding that aggravated assault based on multiple stab wounds merged with malice murder under OCGA § 16-1-7 (a) because there was no evidence that non-fatal stab wounds were separated by a deliberate interval from fatal stab wounds).

Here, the RICO predicate acts for which Sillah was convicted did not solely involve the same conduct or the same victim. Sillah's convictions that also served as RICO predicate acts were based on conduct related to Sampleton's death, offenses against Hrnjak, and the burglary of the Dugas residence. The jury also found that Sillah committed another predicate offense (robbery) that was not separately charged, that involved a different victim, and that was committed more than three months before Sampleton's murder.[5]

---

[5] Kerwin Kirkland testified that, in June 2012, Sillah and others attacked and "stomp[ed]" him, trying to steal his hat, which they ultimately did.

Although the RICO conviction was based in part on conduct that supported other convictions, the predicate acts involved different conduct and different victims, so it was not all the "same conduct." Thus, the RICO conviction did not merge under OCGA § 16-1-7 (a).

*Case No. S22A1175*

8. In his six-page brief, Murray, proceeding pro se on appeal, raises two enumerations of error. In one of his enumerations of error, Murray appears to argue that the trial court failed to consider the merits of his amended motion for new trial after we remanded the case following Murray's first appeal. But the trial court's order stated that it considered "the specific errors alleged" by Murray, and at the hearing following remand, the court indicated that it had received all of Murray's post-conviction filings and considered all of his claims raised in those pleadings, noting that many of them were duplicative. Although the trial court's order did not address each claim in detail, it was not required to. See *Lynn v. State*, 310 Ga. 608, 611 (2) (852 SE2d 843) (2020) ("It is well settled that a trial court is not required to issue written findings of fact and conclusions

42

of law when deciding a motion for new trial.").

In his second enumeration of error, Murray argues that the State failed to present any evidence to support his conviction at the motion for new trial hearing. But the State was not required to present any evidence of guilt at the motion for new trial hearing. When a defendant files a motion for new trial to challenge the sufficiency of the evidence, a defendant typically asserts the general grounds under OCGA § 5-5-20 (that the verdict is contrary to the evidence) or OCGA § 5-5-21 (that the verdict is strongly against the weight of the evidence), and these grounds do not require new evidence beyond the trial record. See *State v. Cash*, 298 Ga. 90, 94 (2) (a) (779 SE2d 603) (2015). Murray makes no argument that the *trial* evidence considered by the jury was insufficient to support his convictions.

*Judgment affirmed in part and vacated in part in Case No. S22A0939. Judgment affirmed in Case No. S22A1175. All the Justices concur.*

Decided February 7, 2023.

Murder. Gwinnett Superior Court. Before Judge Mason.

*Angela B. Dillon*, for appellant (case no. S22A0939).

Andrew F. Murray, *pro se* (case no. S22A1175).

*Patsy Austin-Gatson, District Attorney, Clifford L. Kurlander, Tristan W. Gillespie, Lee F. Tittsworth, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Alex M. Bernick, Parisa F. Sarfarazi, Assistant Attorneys General*, for appellee.