311 Ga. 247
FINAL COPY

S21A0191. MORRIS v. THE STATE.
S21A0192. MORRIS v. THE STATE.

ELLINGTON, Justice.

In 2009, a jury found Mims Michael Morris, Sr. ("Mims"), Mims Michael Morris, Jr. ("Michael"), and Roy Bradshaw ("Roy") guilty of malice murder, felony murder, aggravated assault, and robbery in the fatal beating of Earl Gill.[1] In Case No. S21A0191, Mims appeals,

---

[1] The attack occurred on March 15, 2008. A Putnam County grand jury returned a joint indictment against Mims, Michael, Roy, and Teresa Bradshaw for malice murder (Count 1), felony murder predicated on aggravated assault (Count 2), aggravated assault (Count 3), kidnapping with bodily injury (Count 4), and robbery (Count 5). Following a joint trial of Mims, Michael, and Roy that ended on October 2, 2009, a jury found all three defendants guilty on all counts, except Count 4, which was withdrawn by the State at the close of its case-in-chief. The trial court sentenced Mims and Michael to life in prison for Count 1, 20 years in prison for Count 3, and 20 years in prison for Count 5, with Counts 3 and 5 to run consecutively to the life sentence; Count 2 was vacated by operation of law. Mims and Michael filed timely motions for new trial. Mims amended his motion on January 7, 2020; Michael amended his motion on May 27, 2014, and June 5, 2020. The trial court conducted hearings on the motions on June 12, 2020, and entered an order on Mims's motion on July 13, 2020, and on Michael's motion on August 3, 2020. In the orders, the trial court determined that Count 3 merged with Count 1 as to both Mims and Michael, corrected the sentences to so reflect, and otherwise denied the motions. Mims and Michael filed timely notices of appeal. The cases were docketed in this Court to the term beginning in December 2020, consolidated,

challenging the sufficiency of the evidence supporting his convictions. In Case No. S21A0192, Michael appeals, also challenging the sufficiency of the evidence and contending that the trial court committed plain error in failing to instruct the jury not to consider Roy's statement against him and that he received ineffective assistance of counsel.[2] For the reasons explained below, we affirm in both cases.

Viewed in the light most favorable to the jury's verdicts, the record shows the following. Josh Morris ("Josh") testified as follows. On March 15, 2008, Josh and his brother, Michael, were staying at an EconoLodge in Milledgeville, where they had traveled to do landscaping work with Mims (their father) and Roy. At the time, Mims was staying with Roy and his wife, Teresa Bradshaw ("Teresa"), at the Bradshaws' camp house at the lake. That afternoon, Michael and Josh met Gill, who lived and worked at the EconoLodge. The three of them discussed sharing some marijuana,

---

and submitted for a decision on the briefs.

[2] We have already affirmed Roy's convictions. See *Bradshaw v. State*, 300 Ga. 1 (792 SE2d 672) (2016).

and Michael gave Gill money to purchase some. About 20 minutes after Gill left to get the marijuana, he returned on foot to Josh's room at the EconoLodge; Josh, Josh's wife, Michael, Michael's girlfriend, Mims, Roy, Teresa, and Gill's friend and co-worker, Chris Vukovich, were all in the room. Gill did not have any marijuana or Michael's money, and he told his new friends, "I've been got," meaning that he had been scammed. Gill said that he would go to his sister's house to get money to pay them back. Roy told Gill to "get in the van," and Michael said, "I'm going to ride with y'all" and got into the van. Gill left the EconoLodge in the Bradshaws' van with Roy, Teresa, Mims, and Michael. Later that evening, Roy called Josh and told Josh to "meet him at the store." Josh drove with his wife to the store, Michael got into his truck, and they followed Teresa, Roy, and Mims in the Bradshaws' van to their camp house at the lake.

The chief deputy sheriff, who interviewed Josh after Josh was taken into custody, testified that Josh told him that Josh heard Mims tell Gill "get in the car or I'll kill you." At trial, however, Josh denied hearing Mims tell Gill to get in the van or threatening to kill

3

him.

Michael Robins, a friend of Gill's, testified as follows. He encountered Gill at the EconoLodge that day. Gill, who was with two "young dudes" whom Robins did not know, asked if Robins could get them some marijuana. Robins said that he could, intending to con them, and the two young strangers gave him $25, Gill gave him $10, and Gill and the other two men chipped in a few dollars for gas. Gill rode with Robins and two of Robins's friends to a nearby Walmart, supposedly so that Robins could meet someone who would supply the marijuana. Robins went into Walmart alone, Robins's friends ordered Gill out of the car, and they left Gill at the Walmart.

Teresa was the only witness to testify at trial regarding what transpired after she, Roy, Mims, Michael, and Gill left the EconoLodge in the van.[3] She testified as follows. Teresa drove, Roy sat in the front passenger seat, Gill and Mims sat in the middle passenger seats, and Michael sat on the bench seat in the back. Gill

---

[3] Teresa pleaded guilty to voluntary manslaughter prior to the trial and was sentenced to fifteen years with six to serve in prison on the condition that she testify.

directed them to an apartment to try to find Robins, but Robins was not there. As they continued driving around, Roy got out of his seat in the front, confronted Gill about the missing money, and hit Gill. Then Gill directed Teresa to Possum Point Drive, the street where his sister lived. Gill was unable to find his sister's house, however, and Michael stood up and his "fists went to flying." Michael hit Gill "and kept hitting him and kept hitting him and kept hitting him." While this was happening, Teresa heard Mims say that Michael was hitting Gill so hard that his feet were coming off the floor. Mims said that Michael hit Gill about 15 times, so fast that he could not see the blows and he could feel the wind coming off Michael's fist. Then Teresa heard one of the men say that they should throw Gill out of the van. Roy had Teresa pull to the side of the road. Roy opened the door and told the other men to get out. Either Mims or Michael, or both, dragged Gill from the vehicle by his feet as he grabbed the back of Teresa's seat and begged them to stop.

Teresa testified further as follows. When Mims and Michael had Gill on the ground, they started kicking him. Teresa yelled that

she was leaving, and Mims and Michael got back into the van. Michael was holding Gill's sneakers, and Roy told Teresa to drive away. In the rear-view mirror, Teresa saw Gill get up and walk down the road as she drove away. Mims said that he had been kicking Gill, Gill grabbed his foot, and Mims fell, got back up, and kicked Gill even harder. Michael commented that Gill might have $25 of his but he had something of Gill's — the shoes. Michael tried on the shoes, and they did not fit, so he gave them to Mims, who was wearing "dark beige Hush Puppy-type shoes" at the time. Teresa stopped to buy gas, and Mims and Michael went into the store to buy refreshments. Either Roy or Mims called Josh and told Josh to meet them at the store. After Josh and his wife arrived at the store, they all went to the Bradshaws' lake house for the night.

Joanne Jenkins and Roger Kent, who lived on Possum Point Drive, testified that Gill knocked on their door that night and identified himself as "Earl." His head was bloody, and he seemed disoriented. He asked to be taken to the hospital and told the couple "two men beat me up and threw me out." Kent took Gill to the

6

hospital; hospital personnel alerted law enforcement of the apparent crime.

After arresting Roy, Mims, and Michael four days after the attack, an investigator took photos of Mims's and Roy's hands because they appeared swollen, although Michael's did not. The Putnam County sheriff testified that, after being arrested, Roy admitted that he "popped the man upside the head in the truck" and hit Gill "probably about three times." Roy also told the sheriff, "Yeah, I swung on this guy a couple of times, but I didn't do nothing like that right there. Because, like I said, I didn't have any money involved in this." Although Roy admitted that he hit Gill in the van, Roy claimed that his participation in the attack "didn't happen out of the truck" and that his "feet never hit the ground" when Teresa stopped the van.

The Bradshaws' niece, Brittany Bradshaw, testified that, in the days after the attack, she had conversations with Teresa, Roy, and Mims about what happened when they went to Milledgeville. Brittany testified: "The first thing that [Teresa] had ever said to me

was that she didn't realize how good her husband could fight until she seen him fighting with this other guy." Teresa told Brittany that they had given a man money to buy marijuana, the money was taken from him, and they left in the van so the man could get the money back. Teresa told Brittany that the man could not get the money and that, while Teresa was driving the van, Roy started "beating [the man's] head up against the van and stomping him in the head." Teresa also told Brittany that either Roy or Mims had taken the man's shoes off, "put them on their feet and stomped his head with them." Roy told Brittany that they had jumped on the man, beaten him, and thrown him out of the van. Mims told Brittany that "they had beat the hell out of someone."

Amy Warnock, who considered Teresa her best friend, testified that Teresa told her about the assault on Gill for which Teresa had pleaded guilty. Warnock testified:

> [Teresa] told me that she knew her husband could fight, but she didn't know how well until that weekend. And she said that they went to Milledgeville and they had given a man — no name, just a man — $25 to get them marijuana. The man came back with no money and no

8

marijuana. [The man] and Roy Lee Bradshaw got in [an] argument and began to fight . . . until there was blood in the van everywhere. . . . And they dropped [the man] off.

Gill's blood was found in multiple places inside the Bradshaws' van, along with a bloody baseball bat. Investigators obtained a recording from the security system at the gas station where Teresa stopped after the attack. The security video was played at trial. The security video depicted Mims wearing bright white sneakers when he went into the store to buy beer. Gill's friend Vukovich testified that Gill had bleached and washed his sneakers that morning and that they were "snow white." In the security video, Michael can be seen looking down at the back of both of his own fists, removing a drink from the cooler and rubbing it against the knuckles of his right hand, looking again at the back of his right hand, and then shaking his hand as if in pain. In the security video, as Michael waits to pay for his drink, Teresa is seen opening the door and is heard telling Michael that they needed to leave.

Gill died ten days after the attack from multiple, blunt-force injuries of the head, which included surface bruising and

lacerations, facial bone fractures, a large subdural hemorrhage, and catastrophic swelling of the brain. He also had a broken rib, which the medical examiner testified would not have been fatal.

*Case No. S21A0191*

1. Mims contends that the evidence presented at trial was insufficient to warrant his convictions for malice murder and robbery.[4] We disagree.

(a) As to his murder conviction, Mims argues that the evidence established that either Michael or Roy or both caused Gill's fatal head injuries and that there was no evidence that he aided or encouraged them in beating Gill. And, Mims argues, even if there was evidence that he kicked Gill, there was no evidence that the kicking was a cause of Gill's death.

Mims, Michael, and Roy were jointly charged, "acting together and as parties to the crime," in beating Gill to death. See OCGA §

---

[4] In another enumerated error, Mims also contends that the trial court erred by failing to merge the aggravated assault conviction into the malice murder conviction, but the sentencing error was corrected in the order denying his motion for new trial. Accordingly, this claim of error is moot. See *Williams v. State*, 305 Ga. 776, 784 (4) (827 SE2d 849) (2019).

16-2-20 (b) (A person is a party to a crime if that person "[d]irectly commits the crime; . . . [i]ntentionally aids or abets in the commission of the crime; or . . . [i]ntentionally advises, encourages, hires, counsels, or procures another to commit the crime."). Properly viewed in the light most favorable to the jury's verdicts, see *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979), the evidence showed that, after learning about Michael's lost or stolen money, Mims demanded that Gill get into the van; he verbally encouraged the attack on Gill in the van; and he kicked Gill while Gill lay on the ground. In the days before Mims and the others were arrested, Mims acknowledged his involvement in the brutal attack to the Bradshaws' niece. And when Mims was arrested a few days after the attack on Gill, Mims's hands appeared swollen. The evidence was sufficient for a rational jury to find beyond a reasonable doubt that Mims was a party to Gill's murder, and a conviction for murder was therefore authorized. See id.

(b) As to his robbery conviction, Mims argues that there was no evidence that he took Gill's shoes from Gill's person by use of force,

11

as alleged in the indictment. Rather, he argues, Teresa's testimony shows that Michael took the shoes from Gill: Michael had the shoes when he and Mims got back into the van; Michael tried the shoes on first; and then Michael gave them to Mims. Mims argues that the gas station security video could not support a finding that the white shoes Mims was wearing were Gill's shoes, which were never recovered.

But Mims, Michael, and Roy were charged jointly with robbery, "acting together and as parties to the crime," by stealing Gill's shoes. The evidence shows that, before the attack, Gill was wearing his bright white sneakers and that, after the attack, he was shoeless when he made his way to a house to ask for help. Before being arrested, Teresa told her niece that either Roy or Mims had taken Gill's shoes off, put the shoes on, and stomped Gill's head with them. And at trial, Teresa testified that, after the attack, Michael gave Gill's shoes to Mims, who was depicted wearing white sneakers in the security video, rather than the dark beige Hush Puppy-type shoes he had been wearing earlier. Irrespective of which person took

12

Gill's shoes from his feet, the evidence was sufficient for a rational jury to find beyond a reasonable doubt that Mims was a party to the taking of Gill's shoes by force. See *Jackson*, 443 U. S. at 319 (III) (B).

*Case No. S21A0192*

2. Michael contends that the evidence presented at trial was insufficient to support his convictions because the only evidence that he was more than merely present for the charged crimes was accomplice testimony that was not corroborated by independent evidence, as required by former OCGA § 24-4-8.[5] Specifically, he argues that Teresa was an accomplice and that the only evidence that he participated in the attack on Gill was introduced through her trial testimony and her prior statements that she saw Michael hit Gill and saw Michael return to the van with Gill's shoes after the beating. Michael also argues that Teresa's testimony that she heard Mims make statements about Michael hitting Gill could not

---

[5] Under former OCGA § 24-4-8, which applied to the trial of the case in 2009, "[in] felony cases where the only witness is an accomplice, the testimony of a single witness is not sufficient [to establish a fact]. Nevertheless, corroborating circumstances may dispense with the necessity for the testimony of a second witness[.]"

corroborate her testimony, because Mims's statements only came into evidence through Teresa herself and are not independent of her testimony as an accomplice.

Corroborating evidence that satisfies the requirements of former OCGA § 24-4-8

> may be circumstantial, it may be slight, and it need not of itself be sufficient to warrant a conviction of the crime charged. It must, however, be independent of the accomplice testimony and must directly connect the defendant with the crime, or lead to the inference that he is guilty. Slight evidence from an extraneous source identifying the accused as a participant in the criminal act is sufficient corroboration of the accomplice to support a verdict.

*Styles v. State*, 309 Ga. 463, 466-467 (1) (847 SE2d 325) (2020) (citation and punctuation omitted) (applying former OCGA § 24-4-8). Teresa's testimony and statements about Michael's involvement in the attack were corroborated, including by the testimony and pretrial statement of his brother, Josh, that Michael was angry at the loss of his money and, after Mims told Gill "get in the car or I'll kill you," Michael opted to join in the excursion in the van to go to Gill's sister's house to get money from her. Teresa's statement was

also corroborated by the security video showing Mims, Michael, and Teresa together, minutes after the beating, with Mims wearing bright white shoes like Gill had been wearing that day and Michael looking at his knuckles and shaking his right hand. This circumstantial evidence might not be sufficient on its own to authorize a conviction for murder and robbery, but it provided the corroboration of Teresa's testimony necessary for the jury to find Michael guilty of those offenses. See *Styles*, 309 Ga. at 467 (1); *Taylor v. State*, 297 Ga. 132, 135 (2) (772 SE2d 630) (2015) (applying former OCGA § 24-4-8). The record also shows that the evidence was sufficient to enable a rational trier of fact to find Michael guilty beyond a reasonable doubt as a party to the crimes for which he was convicted. See *Jackson*, 443 U. S. at 319 (III) (B).

3. Michael contends that his trial counsel rendered ineffective assistance by failing to object to the admission of Roy's custodial statement. The statement at issue was introduced through the sheriff, who testified that Roy admitted that he "popped [Gill] upside the head," hit him "probably about three times," and "swung on

15

[him] a couple of times," but claimed, "I didn't do nothing like that right there. Because, like I said, I didn't have any money involved in this."[6] Although, as summarized by the sheriff, Roy did not refer to Michael, Michael argues that, taken in context, Roy's statement obviously leads to the inference that Michael participated in the attack. That context includes the evidence presented at trial that Michael was the person who gave Gill the money that he lost and that Michael was particularly interested in recouping his loss. Because Roy's statement implicated Michael, he argues, introduction of the statement at trial violated his right to confront witnesses under the Sixth Amendment of the United States Constitution and *Bruton v. United States*, 391 U. S. 123 (88 SCt 1620, 20 LE2d 476) (1968), and failure to object on that ground was deficient performance by trial counsel. Michael contends that he was

---

[6] During the hearing on Roy's motion to exclude his custodial statement the sheriff explained that Roy's reference to something "like that right there" was to a photograph of Gill after the attack that the sheriff showed to Roy during the interview. The trial court denied Roy's motion to exclude the statement. The State opted to question the sheriff about the limited portions of the statement set out above, however, and not to play the recording of the interrogation for the jury, so the reference to something "like that right there" was not explained to the jury.

16

prejudiced by counsel's failure to object because, without Roy's statement, the jury would have found that Teresa's testimony about Michael's participation was not corroborated.

To succeed on his claim of ineffective assistance of counsel, Michael "must prove both that his lawyer's performance was professionally deficient and that he was prejudiced as a result." *Styles*, 309 Ga. at 471 (5) (citation and punctuation omitted). See also *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984).

A defendant's Sixth Amendment right to be confronted by the witnesses against him is violated under *Bruton*

> when co-defendants are tried jointly and the testimonial statement of a co-defendant who does not testify at trial is used to implicate another co-defendant in the crime. However, *Bruton* excludes only the statement of a non-testifying co-defendant that standing alone directly inculpates the defendant. *Bruton* is not violated if a co-defendant's statement does not incriminate the defendant on its face and only becomes incriminating when linked with other evidence introduced at trial.

*Pender v. State,* __ Ga. __, __ (2) (a) (__ SE2d __) (2021) (citations and punctuation omitted). See also *Ardis v. State*, 290 Ga. 58, 60 (2)

17

(a) (718 SE2d 526) (2011).

As Michael's argument reveals, Roy's statement only incriminates Michael when combined with other evidence presented at trial from which the jury could conclude that Michael participated in beating Gill and taking his shoes. Consequently, admitting Roy's statement did not violate Michael's right to confront witnesses under the Sixth Amendment and *Bruton*. See *Taylor v. State*, 304 Ga. 41, 45-46 (2) (816 SE2d 17) (2018); *McLean v. State*, 291 Ga. 873, 876 (3) (738 SE2d 267) (2012). Any objection therefore would have been futile, and "[t]he failure to make a meritless motion or objection does not provide a basis upon which to find ineffective assistance of counsel." *White v. State*, 307 Ga. 882, 889 (3) (c) (838 SE2d 828) (2020) (citation and punctuation omitted).

4. Michael contends that, even if Roy's custodial statement did not expressly implicate him, he was entitled under the Confrontation Clause of the Sixth Amendment of the United States Constitution to have the jury instructed that it could consider Roy's statement only against Roy. Without such a limiting instruction,

Michael argues, the jury may have believed, wrongfully, that it could consider Roy's statement as corroboration of Teresa's testimony about Michael's participation. As with his related claim of ineffective assistance of counsel, Michael contends that he was prejudiced because, if the jury had been instructed to consider Roy's statement only against Roy, the jury would have found that Teresa's testimony about Michael's participation was not corroborated. Consequently, Michael contends, the trial court committed plain error by not instructing the jury sua sponte that it could not consider Roy's statement as evidence of Michael's guilt.

> To establish plain error, the appellant
>
> must point to an error that was not affirmatively waived, the error must have been clear and not open to reasonable dispute, the error must have affected his substantial rights, and the error must have seriously affected the fairness, integrity, or public reputation of judicial proceedings. To show that his substantial rights were affected, [the appellant] must make an affirmative showing that the error probably did affect the outcome below. If [the appellant] fails to meet any one of the elements of the plain error test, his claim fails.

*Armstrong v. State,* 310 Ga. 598, 605-606 (4) (852 SE2d 824) (2020)

(citations and punctuation omitted). Assuming without deciding that it was an obvious error not to instruct the jury to limit its use of Roy's statement to the case against Roy,[7] we conclude that Michael fails to show that the error probably affected the outcome below. Although Roy's statement conveyed that he did not inflict Gill's more severe injuries, Roy did not directly identify Michael as a participant in the attack, and there was other substantial evidence that corroborated Teresa's testimony about Michael's participation, as discussed above in Division 2. See *White v. State*, 270 Ga. 804, 810 (4) (b) (514 SE2d 14) (1999). Because Michael failed to show that

---

[7] See *Colton v. State*, 292 Ga. 509, 511 (2) (739 SE2d 380) (2013) ("[A] co-defendant's statement meets the Confrontation Clause's standard for admissibility when it does not refer to the existence of the defendant and is accompanied by instructions limiting its use to the case against the confessing co-defendant.") (citation and punctuation omitted); see also *Richardson v. Marsh*, 481 U. S. 200, 211 (II) (107 SCt 1702, 95 LE2d 176) (1987) ("[T]he Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when . . . the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence."); Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, § 1.31.93 (B) (4th ed. 2020) ("Any out-of-court statement made by one of the defendants on trial in this case after the alleged criminal act has ended may be considered only against the person who made the statement and only if you find that such statement was freely and voluntarily made. If you find that an out-of-court statement was made to the police freely and voluntarily by a defendant on trial in this case, then you are to consider the statement only as against the particular defendant who made it.").

the trial court's instructional error, if any, probably affected the outcome of the trial, his plain error argument fails.

5. Michael contends that his trial counsel rendered ineffective assistance by failing to object to prior consistent statements used to bolster the State's key witness. Specifically, Michael argues that Teresa's testimony that she saw Michael hit Gill and that she heard Mims make statements about Michael's involvement in the attack were repeated multiple times through the sheriff and a detective, who testified that Teresa said the same in her custodial statements.[8] The court instructed the jury to consider prior consistent statements as substantive evidence. Michael argues that, even if Teresa's prior statements were introduced to show that, in her trial testimony, she was trying to minimize Roy's involvement, the statements relating

---

[8] On direct examination, the sheriff testified that Teresa told him that Michael "was back there [in the van] beating [Gill's] tail" and that "Mims bragged on his son about his son's skill beating the man" and about "the prowess of his son's fighting." On cross-examination by Roy's attorney, the sheriff testified that Teresa stated that Michael "was back there hitting on Mr. Gill." On direct examination, the detective testified that Teresa "mentioned that Mims, Sr. was bragging about his son hitting [Gill] inside of the van, that he could feel the breeze off of his son's fists as he came around to strike Mr. Gill."

21

to Michael would not be admissible to rebut a claim of fabrication or motive relating to Roy. And, Michael argues, even if the defendants attacked Teresa's credibility generally, impeachment does not open the door for bolstering the witness's credibility with prior consistent statements.

At the hearing on Michael's motion for new trial, his trial counsel was not asked, and did not volunteer, his rationale in not objecting to testimony about Teresa's prior consistent statements. Even assuming that Teresa's prior consistent statements were objectionable under then-prevailing law,[9] without trial counsel's testimony or some other evidence explaining the basis for his decisions, Michael cannot overcome the presumption that those

---

[9] At the time of Michael's trial in 2009, Georgia case law established that a witness's prior consistent statement is admissible as substantive evidence at trial but

> only where (1) the veracity of a witness's trial testimony has been placed in issue at trial; (2) the witness is present at trial; and (3) the witness is available for cross-examination. A witness's veracity is placed in issue so as to permit the introduction of a prior consistent statement only if affirmative charges of recent fabrication, improper influence, or improper motive are raised during cross-examination.

*Broner v. State*, 284 Ga. 402, 403 (2) (667 SE2d 613) (2008) (citations and punctuation omitted).

decisions were strategic. See *Hill v. State*, 310 Ga. 180, 193-194 (10) (850 SE2d 110) (2020). Teresa's pretrial custodial statements, like her trial testimony, tended to minimize the role of her husband Roy and to focus blame on Michael and Mims for the fatal injuries inflicted on Gill. But those custodial statements, like Teresa's trial testimony, contrasted with her pretrial confidences to her niece and best friend when Teresa spoke about being surprised by Roy's prowess as a fighter and did not mention Michael throwing even a single punch. In light of this contrast, opting not to object to testimony about Teresa's custodial statements was within the realm of objectively reasonable trial strategy, as the trial court found. See *Gardner v. State*, 310 Ga. 515, 518 (2) (852 SE2d 574) (2020) ("[D]ecisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course.") (citation and punctuation omitted). Consequently, Michael's claim of ineffective assistance of counsel fails. See *Davis v. State*, 306 Ga. 140, 148 (3) (g) (829 SE2d 321) (2019).

*Judgments affirmed. All the Justices concur.*


Decided April 5, 2021.

Murder. Putnam Superior Court. Before Judge Trammell.

*Richard O. Allen*, for appellant (case no. S21A0191).

*Danny Wells*, for appellant (case no. S21A0192).

*Stephen A. Bradley, District Attorney, Tuttle W. Barksdale III, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew B. Crowder, Assistant Attorney General*, for appellee.