316 Ga. 225
FINAL COPY

S23A0208. SAYLOR v. THE STATE.

PETERSON, Presiding Justice.

Following a joint trial with co-defendants Darnell Sillah and Andrew Murray, Tavaughn Saylor was convicted of malice murder for the shooting death of Paul Sampleton, Jr., as well as various other crimes.[1] On appeal, Saylor argues that (1) the evidence was

---

[1] Sampleton was killed on December 19, 2012. In June 2014, a Gwinnett County grand jury indicted Sillah, Murray, and Saylor in a 20-count indictment charging them with: malice murder (Count 1); two counts of felony murder, predicated on armed robbery and burglary (Counts 2 and 3); armed robbery (Count 6); burglary (Count 7); false imprisonment (Count 8); aggravated assault of Stevo Hrnjak (Count 9); criminal damage to Hrnjak's property (Count 10); burglary of Joyce Morris (Count 12); conspiracy to rob Sampleton (Count 13); conspiracy to commit burglary at Sampleton's residence (Count 14); violation of the Racketeer Influenced and Corrupt Organizations (RICO) Act (Count 17); and violation of the Street Gang Terrorism and Prevention Act (the "Street Gang Act") (Count 18). Sillah was separately charged with burglary of John Dugas (Count 11), while Murray and Saylor were separately charged with felony murder predicated on possession of a firearm by a convicted felon and possession of a firearm by a convicted felon (Counts 4 and 15 for Murray; Counts 5 and 16 for Saylor). Murray and Saylor also received recidivism notices (Counts 19 and 20).

After a joint trial in October 2014, the jury found all three defendants guilty as to all counts against them except Count 12. Sillah and Murray appealed, and, apart from vacating two of Sillah's convictions due to merger

insufficient to support his convictions for aggravated assault of Stevo Hrnjak and criminal damage to Hrnjak's property; (2) the trial court erred by denying his motion to sever; (3) the trial court erred in striking several jurors; and (4) his conviction for a violation of the Street Gang Terrorism and Prevention Act merged. None of these claims have merit, and we affirm.

In this Court's opinion affirming the convictions of Saylor's co-defendants, we summarized the trial evidence in the light most favorable to the verdicts as follows:

> Sillah, known as "Young," was a member and leader of the Young Wavy Goons ("YWG"), a gang affiliated with the Bloods gang and whose members were mostly high

errors, we affirmed. See *Sillah v. State*, 315 Ga. 741, 758-759 (7)-(8) (883 SE2d 756) (2023).

Saylor was sentenced to life in prison without parole on Count 1; life in prison for Count 6; 20 years in prison for each of Counts 7, 9, and 17; ten years for each of Counts 8, 10, 13 and 14; five years for Count 16; and 15 years for Count 18. The felony murder counts were vacated by operation of law and all counts were to run consecutively, giving Saylor a total sentence of life in prison without parole, followed by life, followed by 120 years. Saylor filed a motion for new trial in October 2014, which he subsequently amended. The motion-for-new-trial court denied the motion in August 2022, except for granting the motion as to certain sentencing claims. Specifically, Saylor's sentence was amended so that Counts 13 and 14 were merged with Counts 6 and 7, respectively; Count 17 was vacated; and Counts 16 and 18 no longer were to run consecutively to Counts 13 and 14, as those counts were merged. Saylor appealed, and his case was docketed to this Court's term beginning in December 2022 and submitted for a decision on the briefs.

2

school students. The gang committed several robberies, burglaries, and car thefts.

In September 2012, Sillah and fellow YWG member Romaine Stewart broke into the house of John Dugas, whose son attended high school with Sillah and Stewart. Sillah and Stewart stole electronics and several firearms from Dugas, including a .45-caliber Sig Sauer.

In December 2012, Sillah was 15 years old and was living with his grandmother and co-defendants [ ] Murray, who is his uncle, and [ ] Saylor, who had relocated to Georgia from New York with Murray. Murray was a gang member affiliated with the Bloods street gang. In late November or early December, Sillah and fellow YWG gang members Stewart and Achiel Morgan discussed robbing Sampleton, a high school classmate, and taking shoes from him. Sampleton had a collection of high-priced sneakers that he would sometimes trade or sell. Murray sent Sillah text messages in mid-December asking "what time son got off the bus?" and "Do son have football practice?" Sampleton was on his high school football team.

On December 17, Stewart, Morgan, and Sillah were heading home on the school bus when they decided to carry out their plan to rob Sampleton after Stewart gave Sampleton a haircut. After Stewart finished cutting Sampleton's hair, he and Sampleton walked to Sampleton's house so that Stewart could get paid. As they got close to Sampleton's neighborhood, Sillah, who had called Stewart repeatedly for updates, told Stewart, "you're supposed to let him walk by hisself [sic] . . . you're messing up the move, you're messing it up[.]" Meanwhile, Murray's car drove by. Stewart, Sillah, and Morgan did not carry out the robbery that day.

Two days later, Sampleton had an early release from school. Sampleton's mother began calling her son at home

around 11:45 a.m. to check on him, but when he did not answer after numerous calls, she asked his father to go to her residence in Grayson to check on Sampleton. Sampleton's father, who arrived at the house around 1:45 p.m., found Sampleton face-down on the kitchen floor, with duct tape over his mouth and his hands bound behind his back. Sampleton was dead and had been shot three times in the head with a .45-caliber gun, possibly a Sig Sauer. A mail carrier in Sampleton's area testified that she heard three gunshots between 12:45 p.m. and 1:15 p.m.

Sampleton was shoeless, the house and garage had been ransacked, and "Home Rep 5CK" was written on a bathroom mirror. A gang expert testified that "Rep 5" signified that the perpetrator was representing "People Nation," which was comprised of several gangs including the Bloods gang, and that "CK" stood for "Crip Killer." Electronics, Sampleton's Billionaire Boys Club sweatshirt, several pairs of his Nike shoes, other clothing, and a bottle of liquor were missing.

Around 2:30 p.m. on the day of Sampleton's death someone fired a gun at Stevo Hrnjak while he was driving south on Interstate 85. Hrnjak stated that he and a silver BMW had been traveling for some time before they both got off at the same exit in Norcross, and when he tried to pass the BMW following a turn, a man in the BMW pulled out a gun and fired two shots at him. Hrnjak said there were at least two men riding in the front of the car but could not tell if there was a passenger in the rear because of the vehicle's dark-tinted windows. After speaking to police, Hrnjak went searching for the silver BMW, finding it at an apartment complex where Anthony English lived.

English frequently bought goods from Murray and re-sold them. English testified that Murray, Sillah, and a man he did not recognize came to his apartment on

4

December 19. They arrived in a silver BMW and Sillah and Murray were carrying handguns. Murray asked if English could sell some items for him. English sold many of the items that were stolen from the Sampleton residence, but he kept the Billionaire Boys Club sweatshirt for himself. Sillah also sold some of the stolen electronics himself and tried to sell a .45-caliber gun.

The defendants were ultimately arrested. At the time of their arrest, Sillah and Saylor were in a silver BMW that matched the description given by Hrnjak. Sillah was interviewed by the police, and a recording of the interview was played at trial. He admitted that he and Stewart discussed robbing Sampleton, but denied participating in the crime. Sillah claimed that on the day of Sampleton's murder, Murray and Saylor picked him up from school and took him back to his neighborhood in a silver BMW. Sillah said he got out of the car just outside his neighborhood and went to meet "Samantha," but Sillah refused to provide any other identifying information because he claimed "Samantha" would allege that he raped her. He said the two of them traveled in her car, which he could not describe other than as "brown," to a park, where he smoked marijuana and they had sex. Cell phone records contradicted Sillah's account of where he claimed to have been.

Timothy Johnson, who was an inmate with Sillah, testified at trial that Sillah admitted to participating in Sampleton's killing. Sillah told Johnson that he, Murray, and Saylor entered Sampleton's home, Saylor tied up Sampleton, and Murray shot Sampleton. Sillah said that he went "back and forth from searching the home to checking the front of the home, being more of a lookout."

*Sillah v. State,* 315 Ga. 741, 743-745 (883 SE2d 756) (2023).

Saylor told a fellow inmate that he came to Georgia to sell drugs. After running out of money, Saylor and Murray began looking at different places to burglarize in order to return to New York. They learned of Sillah's plan to rob Sampleton for his shoes with Stewart and Morgan, and then devised with Sillah a more lucrative plan of robbing Sampleton's house. Saylor also told his fellow inmate that, upon fleeing from Sampleton's murder, Murray shot at another driver because he was afraid the group was being followed. The jury also heard testimony from inmate Johnson that Saylor had admitted that he belonged to a Bloods gang based in the Bronx. Kelvyn West testified that he was a "fence" who would sell stolen goods and, in September 2012, he tried to sell a few stolen guns Sillah provided to him. West testified that on December 20, 2012 (one day after Sampleton's death), he met with Saylor and Murray to procure more goods to sell. During this meeting, Saylor and Murray used "lingo" indicating their membership in a Bloods gang.

1. Saylor argues that the evidence was insufficient to support his convictions for the aggravated assault of Hrnjak (Count 9) and

criminal damage to Hrnjak's property (Count 10). In particular, he argues that the evidence, at most, merely placed him as a passenger in the car, and there was no evidence that he participated in the shooting of Hrnjak's vehicle. We disagree.

When evaluating the sufficiency of evidence, the proper standard of review is whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). "Under this review, we must put aside any questions about conflicting evidence, the credibility of witnesses, or the weight of the evidence, leaving the resolution of such things to the discretion of the trier of fact." *Mims v. State*, 304 Ga. 851, 853 (1) (a) (823 SE2d 325) (2019) (citation and punctuation omitted).

To prove Saylor's guilt, the State was not required to prove that he personally fired at Hrnjak or his vehicle. OCGA § 16-2-20 (a) makes a party to the crime equally culpable, and a defendant is a party to a crime if he "[i]ntentionally aids or abets in the commission of the crime" or "[i]ntentionally advises, encourages, hires, counsels,

7

or procures another to commit the crime." OCGA § 16-2-20 (b) (defining "party to a crime"); see also *White v. State*, 298 Ga. 416, 417 (1) (782 SE2d 280) (2016) ("A person who does not directly commit a crime may be convicted upon proof that a crime was committed and that person was a party to it." (citation and punctuation omitted)).

> Conviction as a party to a crime requires proof that the defendant shared a common criminal intent with the direct perpetrators of the crimes. A jury may infer a common criminal intent from the defendant's presence, companionship, and conduct with other perpetrators before, during, and after the crimes.

*Coates v. State*, 310 Ga. 94, 98 (849 SE2d 435) (2020) (citation and punctuation omitted). Moreover, "[w]hen a group of individuals join together to plan and commit a crime, each member of the criminal plan is responsible for the criminal acts of the others — regardless of whether a particular act was part of the original plan — as long as such crimes were naturally or necessarily done in the execution or furtherance of the common purpose." *Sams v. State*, 314 Ga. 306, 310 (2) (875 SE2d 757) (2022) (citation and punctuation omitted);

see also *Flournoy v. State*, 294 Ga. 741, 745 (3) (755 SE2d 777) (2014) (although OCGA § 16-2-20 "does not use the word 'conspiracy[,]' it is plain that it embodies the theory of conspiracy insofar as it renders one not directly involved in the commission of a crime responsible as a party thereto" (citation and punctuation omitted)).

Here, the evidence shows that Saylor conspired with Murray and Sillah to rob Sampleton, and in executing their plan, they shot and killed him. During their getaway from the murder, a member of the trio shot at Hrnjak's vehicle. Even if Murray was the shooter, as Saylor told a fellow inmate, Saylor also said that Murray shot at Hrnjak because he thought they were being followed. Saylor argues in his brief that he became so angry at Murray for shooting at the vehicle that he did not leave the car when they arrived at English's apartment, and that when Hrnjak later saw the silver BMW he only saw two men inside it, supporting an inference that Saylor abandoned the criminal enterprise. But, based on Saylor's conduct throughout the criminal enterprise and the fact that Saylor was with Sillah when they were later apprehended, the jury was authorized

to reject Saylor's contention that he had withdrawn from the criminal enterprise and to find him guilty of Counts 9 and 10 as a party to those crimes. See *Teasley v. State*, 288 Ga. 468, 470 (704 SE2d 800) (2010) ("[E]ven if a defendant is not involved in all of the crimes charged, those offenses may be imputed to him as an accomplice or co-conspirator because of his actions as a party to some of the crimes charged."); *Crosby v. State*, 232 Ga. 599, 601 (3) (207 SE2d 515) (1974) (member of conspiracy is responsible for actions taken in furtherance of such conspiracy until it ends, including such actions taken to conceal the crime).

2. Saylor argues that the trial court erred in denying his motion to sever his trial. We disagree.

A trial court has broad discretion to grant or deny a motion to sever in a murder case in which the death penalty is not sought. See *Solomon v. State*, 304 Ga. 846, 848 (2) (823 SE2d 265) (2019) (citing OCGA § 17-8-4 (a)). When ruling on such a motion, a court should consider: "(1) the likelihood of confusion of the evidence and law; (2) the possibility that evidence against one defendant may be

considered against the other defendant; and (3) the presence or absence of antagonistic defenses." *Herbert v. State*, 288 Ga. 843, 845 (2) (708 SE2d 260) (2011). To show that the trial court abused its discretion in denying a motion to sever, a defendant must do more than raise the existence of antagonistic defenses or the possibility that a separate trial would have given him a better chance of acquittal. See *Smith v. State*, 308 Ga. 81, 85 (2) (839 SE2d 630) (2020). The defendant must make a clear showing that a joint trial was "so prejudicial as to amount to a denial of his right to due process." *Palmer v. State*, 303 Ga. 810, 815 (III) (814 SE2d 718) (2018) (citation and punctuation omitted).

Saylor has failed to make this showing. This case involved only three defendants who were tried for almost all the same offenses relating to the same incidents. The law and evidence were substantially the same for all of them, and the State argued that the defendants acted in concert in committing the crimes.

Saylor argues that highly prejudicial gang evidence relating to Sillah and Murray "spilled over" to him. But there was evidence that

11

Saylor himself was a gang member, and some of the evidence of Sillah and Murray's gang membership and activities would likely have been admissible against him even if his severance motion had been granted, because the State's theory underlying the Street Gang Act count was that Saylor acted in concert with Sillah and Murray, as gang members, to commit the crimes. See *Nicholson v. State*, 307 Ga. 466, 474 (4) (837 SE2d 362) (2019) (no abuse of discretion in denying motion to sever where neither appellant pointed to any evidence admitted at joint trial with the co-defendant "that would not have been admitted had his severance motion been granted, because the State's evidence was that they acted in concert with each other and other gang members to commit the crimes"). Even if some of the evidence related to Sillah's and Murray's gang activities would not have been admissible against Saylor had he been tried separately, there is no clear showing that this evidence prejudiced him given the evidence of Saylor's gang membership.

Saylor next argues that had he been tried separately he would have had the opportunity to call Sillah and Murray as witnesses.

12

But Saylor had to do more than raise this as a possibility in order to obtain a severance. He had to show that his co-defendants "would, in fact, have been more likely to testify if they were tried separately and that the testimony of the co-defendant[s] would have been exculpatory." *Marquez v. State*, 298 Ga. 448, 450 (2) (782 SE2d 648) (2016). There is no indication that Sillah or Murray would have been likely to offer testimony exculpatory of Saylor if he had been tried separately.

In passing, Saylor also argues that severance was appropriate in order to avoid a violation of *Bruton v. United States*, 391 U.S. 123 (88 SCt 1620, 20 LE2d 476) (1968), because he had no opportunity to cross-examine Sillah or Murray.

> A defendant's Sixth Amendment right to be confronted by the witnesses against him is violated under *Bruton* when co-defendants are tried jointly and the testimonial statement of a co-defendant who does not testify at trial is used to implicate another co-defendant in the crime. However, *Bruton* excludes only the statement of a non-testifying co-defendant that standing alone directly inculpates the defendant. *Bruton* is not violated if a co-defendant's statement does not incriminate the defendant on its face and only becomes incriminating when linked with other evidence

13

introduced at trial.

*Morris v. State*, 311 Ga. 247, 255 (3) (857 SE2d 454) (2021) (citation and punctuation omitted). Saylor does not argue that a *Bruton* violation actually occurred at his trial, and he does not identify any testimonial statements by his co-defendants that directly implicated him. In his statements to law enforcement, Sillah said he was with Murray and Saylor briefly on the day of Sampleton's death, including at English's apartment, but he denied ever participating in the crimes. Sillah's statements alone did not directly incriminate Saylor, so there was no *Bruton* violation arising from Sillah's statement.

Saylor also suggests that there was much more evidence of guilt introduced against Sillah and Murray, as various witnesses described their past conduct. But as we have explained, severance is not required simply because the evidence against a co-defendant is stronger. See *Hurston v. State*, 310 Ga. 818, 826 (3) (a) (854 SE2d 745) (2021). Saylor has failed to make the clear showing that being tried with his co-defendants was so prejudicial as to amount to a

denial of due process.

3. Saylor next argues that the trial court erred in excusing three prospective jurors for cause over his objection. The court struck Juror 41 based on his inability to understand English sufficiently, Juror 95 due to that juror's admission that the strong pain medication he was taking compromised his ability to pay attention, and Juror 116 because she could not put her emotions aside and decide the case only on the evidence and law.

Regardless of whether the trial court abused its discretion in striking any or all of these prospective jurors, Saylor's claim provides no grounds for reversal. It is well settled that a defendant does not have a right in a particular juror but rather only has a right to a legal and impartial jury; the erroneous dismissal for cause of a prospective juror for a reason that is not constitutionally impermissible, like the reasons cited by the trial court here, do not require reversal if there is no showing that a competent and unbiased jury was not selected. See, e.g., *Willis v. State*, 304 Ga. 686, 701 (10) (a) (820 SE2d 640) (2018); *Cannon v. State*, 288 Ga. 225,

229 (5) (702 SE2d 845) (2010); *Coleman v. State*, 286 Ga. 291, 296 (5) (687 SE2d 427) (2009); *Perry v. State*, 264 Ga. 524, 525 (2) (448 SE2d 444) (1994); see also *Carson v. State*, 308 Ga. 761, 771-772 (8) (843 SE2d 421) (2020) (regardless of whether trial court erred in failing to strike a prospective juror for cause, no reversible error existed because the defendant failed to show that an unqualified juror was seated as a result) (citing *Willis*). Because Saylor has failed to show that a competent and unbiased jury was not selected, his claim fails.

4. Saylor next argues that his conviction for violating the Street Gang Act (Count 18) must be vacated because some of the predicate acts underlying that count were also charged separately and had merged or been vacated by operation of law. Saylor argues that because the jury returned a general "guilty" verdict on Count 18, the jury found only that he committed at least one of the listed predicate offenses, and this Court "must assume" that the jury based its verdict on one of the vacated or merged counts. The record does not support Saylor's claim, so it fails.

16

Count 18 charged Saylor with the offense of criminal street gang activity under OCGA § 16-15-4 (a) by participating in gang activity through the commission of *at least one* of several enumerated offenses. The enumerated offenses applicable to Saylor were: malice murder (Count 1); felony murder (Counts 2, 3, and 5); armed robbery (Count 6); burglary (Counts 7 and 12); conspiracy to commit robbery (Count 13); conspiracy to commit burglary (Count 14); and possession of a firearm by a convicted felon (Count 16). Contrary to Saylor's description, the jury in its verdict form did specify which of those predicate acts it found he committed, identifying murder, felony murder, armed robbery, burglary, conspiracy to commit robbery, conspiracy to commit burglary, and possession of a firearm by a convicted felon. Of the acts that were separately charged as substantive counts, the only counts that were vacated or merged were the felony murder counts and the conspiracy counts. That left Saylor's convictions for malice murder, armed robbery, burglary, and the firearm-possession count, any one of which could serve as a predicate act for his violation of the Street

17

Gang Act. Because we know what predicate acts the jury found Saylor committed, and at least one of those acts for which he was separately convicted was not merged or vacated, Saylor's claim fails.

*Judgment affirmed. All the Justices concur.*

Decided May 2, 2023.

Murder. Gwinnett Superior Court. Before Judge Mason.

*Clark & Towne, Jessica R. Towne*, for appellant.

*Patsy Austin-Gatson, District Attorney, Clifford L. Kurlander, Christopher M. DeNeve, Assistant District Attorneys; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Alex M. Bernick, Assistant Attorney General*, for appellee.