NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: November 7, 2023

S23A0956. NEASON v. THE STATE.

LaGrua, Justice.

Appellant Armetrius Neason was convicted of malice murder and a related charge in connection with the shooting death of Teresa Carter.[1] On appeal, Neason contends the evidence was insufficient

---

[1] The shooting occurred on July 16, 2012. The record does not include Neason's original indictment, but on November 22, 2013, a Fulton County grand jury reindicted Neason for malice murder (Count 1), felony murder predicated on aggravated assault (Count 2), aggravated assault with a deadly weapon (Count 3), and possession of a firearm during the commission of a felony (Count 4). Neason was tried in December 2013, where a jury found him guilty on all counts. The trial court merged Counts 2 and 3 with Count 1 and sentenced Neason to serve life in prison with the possibility of parole for Count 1, plus five years consecutive to serve on Count 4. Neason timely filed a motion for a new trial and subsequently filed multiple amended motions for a new trial, the last being filed by new counsel on December 6, 2022. On March 3, 2023, after holding an evidentiary hearing, the trial court denied the amended motion for new trial. The same day, the trial court also entered an order correcting Neason's sentence to vacate, rather than merge, the felony murder count. Neason filed a notice of appeal of the order denying a new trial to the Court of Appeals, which transferred his appeal to this Court. Accordingly, the case was docketed to the Court's August 2023 term and submitted for a decision on the briefs.

as a matter of federal constitutional due process. For the reasons below, we conclude the evidence was sufficient.

Viewed in the light most favorable to the verdicts, the evidence presented at Neason's trial showed that on July 14, 2012, Carter and Malcom Wiley met Neason outside his apartment on Myrtle Drive in Atlanta for Carter to buy crack cocaine from Neason. Carter paid Neason with a $100 bill, but later that day Neason told Wiley that he believed the bill was fake.

Two days later, on July 16, Wiley testified he was walking down Myrtle Drive around 3:00 p.m. with two drug dealers for whom he was helping find customers. The three men approached the section of the street in front of Neason's apartment building, and Wiley noticed Neason standing near the building. A few minutes later, Carter arrived and purchased drugs from Wiley and the two dealers. After the transaction, Wiley and the two dealers walked south down the street, leaving Carter standing by a fence alone in front of Neason's apartment building.

As Wiley walked toward the end of Myrtle Drive facing away

from Carter, Wiley heard a gunshot, turned around, and saw Neason within arm's reach of Carter, pointing a .380-caliber pistol at her. Neason shot Carter as she fell, then shot her three more times as she lay on the ground. After the shooting, Neason started moving towards Wiley, so Wiley ran away before turning back around to see Neason cross the street and enter another apartment complex. Once Neason left, Wiley ran to Carter, felt her pulse, presumed her dead, and called 911.

Wildrego Jackson, who knew Neason, Carter, and Wiley, also testified he heard a gunshot while in his apartment that afternoon and quickly looked out his back patio, which had a south-facing view of the relevant portion of Myrtle Drive. From his patio, Jackson saw Neason standing eight to ten feet from Carter holding a chrome, .380-caliber pistol with his right hand. Neason shot Carter two to three times as she fell, then Neason left the scene, crossing the street into another apartment complex through a fence.

Surveillance footage did not capture the shooting but did show Wiley and two others encounter Carter on Myrtle Drive shortly

3

before 3:00 p.m. on the day of the shooting. Footage also showed Neason crossing the street three minutes later holding a shirt or towel in his left hand and an object in his right hand as he entered an apartment complex through a fence.

Police arrived at the scene at 3:08 p.m. and found Carter dead. Deputy Sheriff Steven Ford and Detective Summer Benton began talking to the dozens of people from the neighborhood who had already congregated on the street near the crime scene. Deputy Ford testified that Wiley approached him, told him "Black" was the shooter, identified Neason's mother and brother as the shooter's mother and brother, and said the shooting was over a $20 drug deal. Deputy Ford was the beat officer for the neighborhood, was already familiar with Neason, and believed "Black" was one of Neason's nicknames, though other witnesses referred to Neason as "Michi."

As those in the neighborhood and law enforcement responded to the shooting, Jackson initially remained in his apartment. He testified he tended to "personal business" for several minutes before leaving and was also hesitant to leave for fear of being shot himself.

4

Jackson testified he was outside at the scene 15 to 20 minutes after the shooting, though surveillance footage of the only door to his apartment did not show Jackson exiting during the approximately 30 minutes after the shooting. Once outside, Jackson received a phone call from a friend telling him where Neason was located. Jackson and another friend drove to find Neason. They found him walking one block over from the shooting on Plaza Lane, on the other side of the apartment complex where Jackson and Wiley saw Neason go after the shooting. Staying in the car, Jackson asked Neason why he shot Carter, and Neason complained she paid him with a fake bill. Jackson got out of the car and began to hit Neason, and within a moment, Jackson was joined by eight to ten other men. Hearing the commotion while still at the crime scene, Wiley walked to the fight on Plaza Lane and testified he heard Neason yelling, "You all going to do this about a b***h? A g*****n junky a** b***h." Another neighborhood resident, Bruce King, testified he was also present at the fight and heard Neason say, "I didn't do it" and "the $100 was fake."

Minutes after the fight began, police officers, including Deputy Ford, arrived, and Jackson and the other individuals at the fight fled the scene. Neason was severely injured and covered in blood, and he tried to run from the police officers. The police officers apprehended Neason and placed him in an ambulance, where a crime scene investigator swabbed his hands for gunshot residue before Neason went to the hospital.

The next day, Deputy Ford and Detective Benton interviewed Wiley. Detective Benton testified Wiley told her that he saw the shooting, picked Neason out of a photo line-up, explained the July 14 drug deal and fake $100 bill, and said the gun used was a .380-caliber pistol. At trial, Wiley testified he was shown an additional photo line-up on the day of the shooting, where he identified Neason as the shooter. After talking to Wiley, Detective Benton obtained an arrest warrant and arrested Neason for Carter's murder.

Investigators retrieved three .380-caliber cartridge casings in the area surrounding where the shooting occurred. The medical examiner testified that Carter had graze wounds on her shoulder

6

and face, two bullet entry wounds on her head, and a bullet entry and exit wound through her chest consistent with being shot in the torso while standing, then shot approximately three times while she was lying on the ground. One .380-caliber bullet was recovered from Carter's body during the autopsy. Police officers also recovered a bloodied orange shirt off Plaza Lane within 50 yards from where Jackson and others assaulted Neason.[2] Forensic testing revealed Neason's blood and particles of gunshot residue on the orange shirt and one particle of gunshot residue on Neason's right hand. A firearms expert testified that gunshot residue continues to deposit within three to five feet of a fired weapon, meaning that Neason and the orange shirt were at some point within a few feet of a fired gun or were in close contact with someone who was.

Neason contends the trial court erred in denying his motion for

---

[2] Surveillance footage showed Neason wearing a white or light-colored t-shirt, and, in closing arguments, the prosecutor stated Neason wore a white shirt. When Neason was found by police officers, he was shirtless. Neither Jackson nor Wiley could remember what Neason was wearing during and after the shooting, and King testified that Neason was not wearing a shirt before the assault.

a new trial because the evidence presented at trial was insufficient to support his convictions. We disagree.

When evaluating a challenge to the sufficiency of the evidence as a matter of federal constitutional due process, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LEd2d 560) (1979) (emphasis in original); *Copeland v. State*, 314 Ga. 44, 47 (2) (875 SE2d 636) (2022). "This Court will uphold the jury's verdict as long as there is some competent evidence, even if contradicted, to support each fact necessary to make out the State's case." *Huff v. State*, 315 Ga. 558, 562 (1) (883 SE2d 773) (2023) (citation and punctuation omitted). Accordingly, this Court "must put aside any questions about conflicting evidence, the credibility of witnesses, or the weight of the evidence, leaving the resolution of such things to the discretion of the trier of fact." *Saylor v. State*, 316 Ga. 225, 229 (1) (887 SE2d 329) (2023) (citation and punctuation

omitted).

The evidence presented here was sufficient to authorize the jury to find Neason guilty beyond a reasonable doubt of malice murder and possession of a firearm during the commission of a felony. Two eyewitnesses—Wiley and Jackson—testified that they watched Neason shoot Carter multiple times in a manner consistent with Carter's injuries. The testimony of Wiley and Jackson was similar, they both knew Neason, Wiley saw Neason nearby minutes before the shooting, and surveillance footage showed Neason near the area of the shooting shortly after Carter was shot. Further, Neason had a clear motive to shoot Carter, whom he believed paid him with a fake bill two days prior, and Neason fled from officers when they broke up the assault against him. See *Rowland v. State*, 306 Ga. 59, 65 n.4 (829 SE2d 81) (2019) (noting a defendant's flight is "generally admissible as circumstantial evidence of guilt").

Neason questions the eyewitness testimony of Wiley and Jackson. Neason contends the evidence showed that Wiley had poor eyesight and it was unclear exactly how far away he was when he

viewed the shooting, and Jackson did not talk to investigators until the weeks before trial and, when testifying, could not explain why surveillance footage did not show him leaving his apartment when he said he left. However, "[w]e leave to the trier of fact the resolution of conflicts or inconsistencies in the evidence, credibility of witnesses, and reasonable inferences to be derived from the facts, and we do not reweigh the evidence." *Butler v. State*, 313 Ga. 675, 679 (2) (872 SE2d 722) (2022) (citations and punctuation omitted). The jury was presented with the evidence, including any inconsistencies outlined by Neason, weighed the evidence, and found him guilty. See *Santana v. State*, 308 Ga. 706, 709 (1) (842 SE2d 14) (2020) ("It was for the jury to assess the credibility of the witnesses . . . and to resolve any discrepancies in the evidence presented at trial."); *Graves v. State*, 298 Ga. 551, 553 (1) (783 SE2d 891) (2016) ("Though [the defendant] contends that the evidence was insufficient because the State's witnesses were impeached or incredible, it is axiomatic that resolving evidentiary conflicts and assessing witness credibility are within the exclusive province of the

10

jury.").

Neason also argues the State presented no physical evidence connecting him to the shooting. But the evidence showed that Neason had gunshot residue on his hand, and the State is not required to produce any physical evidence. See *Jackson v. State*, 301 Ga. 866, 867 (1) (804 SE2d 367) (2017) ("[T]he State was not required to produce any physical evidence, and it was for the jury to determine the credibility of the eyewitnesses."). Accordingly, and in light of the ample evidence showing Neason shot and killed Carter unlawfully and with malice aforethought, the evidence was sufficient to support his convictions as a matter of federal constitutional due process under *Jackson*.

*Judgment affirmed. All the Justices concur.*