**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the
# Supreme Court of Georgia

No. S26A0144
Jonathan Banks
v.
The State

On appeal from the Superior Court of Fulton County
No. 16SC143159

Decided: June 16, 2026

ELLINGTON, Justice.

A Fulton County jury found appellant Jonathan Banks, as well as his co-defendants James Calhoun and James Sims (together, "the defendants"), guilty of malice murder and other crimes in connection with the shooting death of Pamela Williams and the burglary of her home.[1] Banks contends that the evidence

---

[1] The crimes occurred on November 30, 2013. On April 12, 2016, Banks was indicted along with his co-defendants, Calhoun and Sims, by a Fulton County grand jury for malice murder (Count 1); felony murder predicated on aggravated assault (Counts 2); felony murder predicated on burglary (Count 3); aggravated assault (Count 5); burglary in the first degree of Williams's home (Count 6); and possession of a firearm during the commission of a felony (Count 9). Banks was charged individually with felony murder predicated on possession of a firearm by a convicted felon (Count 4) and possession of a firearm by a convicted felon (Count 10). Sims was charged individually with burglary in the first degree of the home of Deborah Huddleston (Count 8) and Calhoun was charged individually with burglary in the first degree of the home of Corey Robinson (Count 7). The court severed Counts 7 and 8, and those charges were not presented to the jury.

was insufficient to support the jury's verdicts. He also contends that the trial court abused its discretion in admitting certain evidence, in denying certain motions for a mistrial, in denying motions to strike the jury panel and to sever the defendants' trials, and in sentencing Banks. Finally, he argues that he received constitutionally ineffective assistance of counsel. For the reasons explained below, these claims of error fail.

In *Sims v. State*, ___ Ga. ___, S26A0143, slip op. at 2-8 (Ga. June 2, 2026), wherein we affirmed the convictions of one of

---

After a joint jury trial that began on September 27, 2016, Banks was found guilty on all the charges against him. (The jury also returned guilty verdicts against Calhoun and Sims, both of whom filed separate appeals. See *Sims v. State*, ___ Ga. ___, S26A0143 (June 2, 2026); *Calhoun v. State*, ___ Ga. ___, S26A0145 (June __, 2026)). The trial court sentenced Banks on December 15, 2016, to life in prison without the possibility of parole for malice murder (Count 1); 20 years in prison, consecutive to Count 1, for burglary (Count 6); five years in prison, consecutive to Count 6, for possession of a firearm during the commission of a felony (Count 9); and five years in prison, consecutive to Count 9, for possession of a firearm by a convicted felon (Count 10). The remaining counts (Counts 2 through 5) were vacated by operation of law or merged for sentencing purposes.

On December 20, 2016, Banks timely filed a motion for new trial, which new counsel amended on December 18, 2020. After a hearing, the trial court denied the motion on July 27, 2023. On August 1, 2023, Banks timely filed a notice of appeal. On September 3, 2025, his appeal was docketed to the term of this Court beginning in December 2025, and the case was submitted for a decision on the briefs.

We note the almost seven-year delay in resolving Banks's motion for new trial and another two-year delay for the appeal to be docketed in this Court. The trial court apparently had not ruled on Banks's first new trial motion, filed in 2016, when Banks amended that motion in 2020. We "reiterate that it is the duty of all those involved in the criminal justice system, including trial courts and prosecutors as well as defense counsel and defendants, to ensure that the appropriate post-conviction motions are filed, litigated, and decided without unnecessary delay." *Owens v. State*, 303 Ga. 254, 258 (2018) (quotation marks omitted).

2

Banks's co-defendants, Sims, we set forth the facts as follows:

Viewed in the light most favorable to the jury's verdicts, the trial transcript shows the following. On the evening of November 30, 2013, the defendants met in front of Sims's house in the Amhurst subdivision in Fulton County. The defendants' movements in and through the neighborhood that evening were witnessed by Jerry Link, the subdivision's security officer. At dusk, the defendants walked the short distance from Sims's house to Williams's house along a "cut," a makeshift footpath through neighboring yards in the Amhurst subdivision. At this point, Link lost sight of the defendants. Williams, who was home alone, called 911 at 8:07 p.m. to report suspicious activity outside her home. While she was on the phone with the 911 operator and his supervisor, she reported hearing people ringing her doorbell repeatedly, her dog barking, and then people entering her home. Williams hid in the closet of her master bedroom, crouching low and whispering to the 911 operator as the defendants searched her home for valuables. Then the 911 operator heard Williams scream. Shortly thereafter, the telephone connection was lost. Williams screamed because Banks had discovered her hiding in the closet. Banks pressed his gun to Williams's head and shot her.

Although Williams's alarm system was armed, it was not triggered when the defendants entered her home because the patio window through which they entered did not have an alarm sensor.

Instead, the alarm was triggered at 8:20 p.m., shortly after the police arrived and entered the house. Officer Michael Guin arrived at Williams's home at 8:14 p.m. and waited for backup to arrive. When Corporal Willis Reed arrived, they entered the home and found Williams breathing but unconscious, slumped to the floor in her bedroom closet with a gunshot wound to the head. Guin noticed that Williams had been hiding in a smaller "closet within the closet" and that her phone had fallen between her knees. Paramedics transported Williams to Grady Hospital. She died there on December 2, 2013. The cause of death was a single, contact gunshot wound to the head. The medical examiner testified that Williams likely would have been sitting on the floor, looking up at Banks, when he pressed the gun's muzzle to her forehead and shot her.

After Banks shot Williams, he and the others fled from the house on foot and, shortly thereafter, sped out of the neighborhood in their cars. Banks hid at the home of Sims's cousins, Cassandra and Joseph Hockaday. According to the Hockadays, who gave statements to the police and testified at trial, Banks admitted to them that he, Calhoun, and Sims had broken into Williams's home. Banks confessed that, when he discovered Williams in her closet, he "accidentally" shot her. Banks also said he hid the murder weapon "somewhere around the [Hockadays'] house" but, later, he and Calhoun moved it.

4

In the following days, Banks called his mother several times. Banks's mother asked him whether he had been involved in the shooting, and Banks admitted that he "was back there." After the shooting, Banks told his father that "me and my crew  f***** up." Banks's father reported this statement to an investigator. When Banks's father asked Banks whether he had shot and killed someone, Banks responded "I don't know." Banks also asked his parents for money so that he could "get out of town." Banks's father gave the police the street names of five people in his son's "crew." Shortly thereafter, the police obtained warrants for Banks, Calhoun and Sims, and they were arrested in mid-December of 2013.

Link, the subdivision's security officer, testified that, during the evening of November 30, as he patrolled the neighborhood in his car, he saw a group of young men, including Calhoun, Banks, and Sims, standing in front of Sims's house. Sims's and Calhoun's houses are near each other on the same street, and Banks was staying with Sims. Link saw Calhoun, Banks, and Sims enter a silver-gray car with two other people at around 7:40 p.m. He watched the car leave but did not follow it. About ten minutes later, while Link was patrolling the subdivision, he saw the same silver-gray car parked on the side of the road near Williams's house. Link testified that he saw the car's interior lights turn on as several people exited the car. Then the car sped away. Given that the neighborhood had experienced

"[w]ell over 150" burglaries, Link was suspicious of what he was seeing. He began scanning the area and saw Banks standing near a retention pond by Williams's house. He also spotted a group of young men, including Calhoun and Sims, standing behind her house.

Believing that the young men were returning to either Sims's or Calhoun's house by way of the path through the woods, Link drove back to Sims's home. When he got there, he did not see the men, but he saw a red Pontiac and a blue Chevy parked in front of Calhoun's house. Link had seen the defendants in those cars earlier in the day. He testified that he had recorded the tag numbers of those cars as well as the tag numbers for the silver-gray car. After a few minutes, Link returned to Williams's street to see if he could find the young men. As he passed by the home of Eddie Muhammad, he spotted a group of young men, including Calhoun, Banks, and Sims, running through the neighborhood toward the path that led back to their homes. Then, at 8:22 pm, Link saw the red and blue cars that had been parked in front of Calhoun's and Sims's houses speed out of the subdivision. Later that evening, Link shared this information with the police.

The following day, Link discovered a jewelry box lying on the ground along the path he had seen Calhoun, Banks, and Sims use to flee after the shooting. Believing that the box may have been stolen from Williams, he called the police to collect

it. In addition to the jewelry box, the police collected a ring box, a black hooded sweatshirt, and a black skull cap along the path through the woods near Williams's home. Link testified that, also on the day following the shooting, he saw Sims's mother cleaning out the garage and disposing of clothing, including an orange jacket matching one he had seen Sims wearing on the night of the shooting. Link also saw Calhoun "roaming around[,] looking at the ground" in the area where Link had discovered the jewelry box. Link testified that much of what he had seen concerning the defendants' movements from the night of the shooting had been recorded on his car's dash camera and that he turned those recordings over to the police. Several of those recordings were admitted in evidence and played for the jury.

Williams's immediate neighbors also testified concerning events on the night of the shooting. Louis Lindo testified that, as he was standing at the end of his driveway, he saw a group of young men walking toward Williams's house. Muhammad testified that his dogs were barking that evening like someone was walking by his house. Joshua Williams, who lived next door to Williams, saw a group of five young men run from behind her house along the cut between their houses as he was getting clothes out of the trunk of his car. Yvens Resilard, whose home was located between Williams's and Sim's homes, testified that around 8:00 p.m., he heard his dogs barking excessively, and when he went downstairs

7

to check on them, he noticed that his motion sensor lights were on. Derrick McKnight, who was visiting his sister, testified that he spotted a group of five young men lurking outside his sister's home. McKnight's sister's home was also located between Williams's and Sims's homes. When McKnight turned on the outside floodlights, he saw five young men wearing dark clothing. One wore a skull cap. McKnight observed the men "scatter" and try to "hide." The men then all ran off together in the same direction.

The State also admitted evidence of prior acts involving Calhoun and Sims. Marcus Greer, who was given immunity from prosecution in exchange for his cooperation, testified that he, Calhoun, Sims, and two others broke into Melissa Burke's home on January 13, 2013. Burke had been home alone when she heard the doorbell ring. From her upstairs window, she saw two young men at her front door. When they continued to ring her doorbell, Burke called 911. As she did so, the young men climbed through a second-floor window on the back of her home. They began searching for things to steal. Burke testified that she hid in the closet, but one of the young men found her. She saw the closet door swing open, heard a gunshot, and realized that she had been shot. The shooter kept firing until his gun ran out of ammunition. Burke testified that someone said: "Man, she's dead. Let's just get out of here." As the young men left her home, they triggered her alarm system. The alarm system did not go off when

they entered the home because they had entered through a window that did not have an alarm sensor. Burke identified Calhoun at trial as the man who shot her.

Monica Salinas, who lived in the Cooks Landing subdivision in Fulton County, testified that on September 18, 2013, she heard a doorbell ring and saw two young men standing outside her front door. When she did not answer the door, they rang her doorbell "20, 15 times consistently, just constantly ringing the doorbell." Moments later, her dogs started barking in the back yard. She called 911, and while she was on the phone, one of the men threw a rock through her window, shattering the glass. When the men spotted Salinas in the upstairs window, one threw a rock at her and then fled. Shortly thereafter, the two men were apprehended by the police. Salinas and a sanitation worker who saw the men fleeing from Salinas's home identified one of them as Calhoun.

On October 30, 2013, Corey Robinson's home in the Amhurst subdivision was burglarized. The burglars stole laptop computers, watches, a television, and a jewelry box. The police recovered a palm print from the home and later matched it to Calhoun's palm print.

1. Banks contends that the evidence was insufficient to

9

support his convictions as a matter of constitutional due process.[2] In evaluating Banks's challenge to the sufficiency of the evidence, "we view the evidence presented at trial in the light most favorable to the verdicts and ask whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted." *Jackson v. State*, 311 Ga. 626, 629 (2021) (quotation marks omitted). "This Court does not reweigh evidence or resolve conflicts in testimony; instead, evidence is reviewed in a light most favorable to the verdict, with deference to the jury's assessment of the weight and credibility of the evidence." Id. at 630 (quotation marks omitted).

(a) So viewed, the evidence was sufficient to support the jury's finding that Banks committed malice murder. A person is guilty of malice murder if "he unlawfully and with malice aforethought, either express or implied, causes the death of another human being." OCGA § 16-5-1(a). See also *Welch v. State*, 306 Ga. 470, 473 (2019). The Hockadays testified that Banks told them that he shot Williams during the burglary, though he claimed the shooting was accidental. Banks also told his father that he and his "crew" had "f***ed up." With respect to Banks's criminal intent, the evidence supports the jury's conclusion that he intentionally killed Williams. The jury could infer from the

---

[2] Banks also argues that the evidence was wholly circumstantial and did not exclude every other reasonable hypothesis save that of his own guilt, as required by OCGA § 24-14-6. However, the evidence in this case included direct as well as circumstantial evidence. Specifically, Banks's admission as well as witness testimony about that admission constituted direct evidence. See *Green v. State*, 322 Ga. 617, 621 (2025). Therefore, we need not evaluate whether the facts proved at trial were sufficient to sustain a conviction under OCGA § 24-14-6. See *Montgomery v. State*, 323 Ga. 188, 191 (2025) ("Because the State presented direct evidence of [the appellant's] guilt, OCGA § 24-14-6 does not apply[.]")

medical examiner's expert testimony concerning William's contact gunshot wound that Banks had deliberately pressed the gun to her head and executed her after he discovered her crouched down, hiding in the closet.

Further, based on the evidence presented, the jury could also infer that the burglary crew's scheme was to verify that a home was empty before entering it by repeatedly ringing the doorbell. They would then enter the home through windows without alarm sensors. And they carried firearms because, if they came upon a homeowner, they would not leave the homeowner alive to identify them. In fact, Calhoun, a member of the burglary crew, had similarly shot Burke multiple times and left her for dead after the crew discovered her hiding in her closet. This evidence was constitutionally sufficient to support Banks's conviction for malice murder. See *Welch*, 306 Ga. at 471–73 (concluding that the evidence, which included forensic evidence and the defendant's admissions, was sufficient to convict the defendant of a malice murder he committed during a burglary).

(b) The same evidence set forth above also supports Banks's convictions for burglary, OCGA § 16-7-1(b),[3] possession of a firearm during the commission of a felony, OCGA § 16-11-106(b),[4] and possession of a firearm by a convicted felon, OCGA §

---

[3] OCGA § 16-7-1(b) provides, in pertinent part:
A person commits the offense of burglary in the first degree when, without authority and with the intent to commit a felony or theft therein, he or she enters or remains within an occupied, unoccupied, or vacant dwelling house of another or any building, vehicle, railroad car, watercraft, aircraft, or other such structure designed for use as the dwelling of another.

[4] OCGA § 16-11-106(b) provides, in pertinent part: "Any person who shall have on or within arm's reach of his or her person a firearm or a knife

11

16-11-131(b).[5] Specifically, the evidence presented at trial—including Link's testimony, Greer's testimony about the robbing crew's activities, and Banks's admissions to the Hockadays about participating in the crimes—supports the conclusion that Banks, a convicted felon,[6] entered Williams's home without authority for the purpose of committing theft and that he carried a firearm with him, which he used to kill Williams. See *Blackshear v. State*, 309 Ga. 479, 484 (2022) (holding that the evidence was sufficient to support the defendant's burglary conviction where it showed that the defendant entered the victim's home without authority and for the purpose of committing a theft); *Hall v. State* 308 Ga. 475, 478–79 (2020) (holding that the evidence was sufficient to support the defendant's conviction for possession of a firearm during the commission of a felony and possession of a firearm by a convicted felon).

2. Banks contends that the trial court abused its discretion in denying a motion to strike the jury after a potential juror made prejudicial statements to members of the jury pool, instead of striking only the juror who made the statements. The record shows that Jury Panelist 49 (later selected as Juror 8) made a comment to Panelist 48 that she thought "the defendants are guilty." Panelist 48, who was not selected for the jury, brought the matter to the trial court's attention after the jury had been

---

having a blade of three or more inches in length during the commission of, or the attempt to commit" any of the listed offenses, including "(1) Any crime against or involving the person of another; [and] (2) The unlawful entry into a building or vehicle[,]" "and which crime is a felony, commits a felony."

[5] OCGA § 16-11-131(b) provides, in pertinent part: "Any person … who has been convicted of a felony by a court of this state … and who receives, possesses, or transports any firearm commits a felony[.]"

[6] Banks testified that he pled guilty to criminal attempt to commit burglary in 2007 and, in 2011, to burglary and theft by taking.

12

selected but before they were sworn and impaneled. Counsel for all three defendants objected and asked for the entire jury panel to be stricken as it was likely tainted by these comments. The panel of remaining potential jurors, however, had already been dismissed. Panelist 48 and Juror 8 were brought back into the courtroom for further voir dire concerning the circumstances surrounding the comments, Panelist 48 testified that she did not believe that anyone else overheard the comments, and Juror 8 stated that she did not recall expressing that opinion to anyone else. After hearing their testimony, the trial court ruled that the appropriate remedy was to strike Juror 8 from the petit jury, and she was excused from service. Banks objected and asked the court to strike the entire jury and to restart the jury selection process. Banks contends the trial court's ruling constituted reversible error.

We resolved this claim in *Sims*, slip op. at 12-14, concluding that the record supported the trial court's finding that the comment was confined to two people who did not participate as jurors on the defendants' petit jury and that there is no evidence that any seated juror could have heard the comment and been prejudiced by it. Banks has not shown that he was denied his right to a fair trial when the court denied his request to dismiss the jury panel and start jury selection anew. Consequently, the trial court did not abuse its discretion denying Banks's motion. See id.

3. Banks contends the trial court abused its discretion in denying his motion to sever the defendants' trials. We considered whether the defendants' trials should have been severed in *Sims*, slip op. at 19-21, holding that the record showed that the trial court did not abuse its discretion in denying the defendants' motions to sever and that the record clearly supported the trial

13

court's ruling. In this case, Banks makes arguments similar to those raised by Sims, complaining generally about antagonistic defenses and the admission of prior acts evidence. In *Sims*, we concluded that the primary evidence against the three co-defendants came from the same sources: Link's testimony concerning his observations on the night of the shooting and Banks's admissions to the Hockadays. Further, the jury was instructed on the law concerning mere presence, mere association, and parties to a crime, and the defendants' defenses were not antagonistic to each other. All three denied being present and did not shift the blame to each other. And, like Sims, Banks failed to carry his burden on appeal of showing that he was clearly prejudiced by a joint trial. Thus, for the same reasons that we rejected this claim in Sims, we reject it with respect to Banks. See id.

4. Banks contends that the trial court abused its discretion in admitting in evidence a life-size replica of Williams's bedroom closet for several reasons, including that it violated his Sixth Amendment right under the United States Constitution to confront a witness against him because the replica temporarily blocked his view of the witness testifying about the replica. He also argues that the replica was not relevant to any issue at trial but, even if the replica was relevant, its probative value was "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." See OCGA § 24-4-403 ("Rule 403"). He further contends that the replica was inaccurate, inherently prejudicial, and likely improperly impacted the outcome of the trial. Consequently, he argues that the trial court abused its discretion in allowing the State to use the demonstrative evidence. We resolved all but one of these

14

arguments in *Sims,* slip op. at 16-18, concluding that, considering the record as a whole, the trial court did not abuse its discretion in admitting the evidence because the replica was accurate and relevant and its probative value was not outweighed by any Rule 403 considerations. Sims, however, did not argue that the closet replica caused a denial of his Sixth Amendment right to confront and cross-examine the witness against him by blocking his view of a State's witness testifying on direct examination. We consider that contention now.

The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right … to be confronted with the witnesses against him." US Const. Amend. VI.

> The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact. The word "confront," after all, also means a clashing of forces or ideas, thus carrying with it the notion of adversariness.

*Maryland v. Craig,* 497 U.S. 836, 845 (1990). The right to confront witnesses under the Confrontation Clause "guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact." See *Coy v. Iowa*, 487 US 1012, 1015-20 (1988) (citation omitted). See also *Crawford v. Washington*, 541 US 36, 43–50 (2004) (discussing generally the common law tradition in criminal trials "of live testimony in court subject to adversarial testing"). In *Craig,* the Court explained that face-to-face confrontation enhances the accuracy of factfinding by reducing the risk that a witness will wrongfully implicate an innocent person. It also serves a strong symbolic purpose by requiring

15

adverse witnesses at trial to testify in the accused's presence. 497 U.S. at 846–47. However, the face-to-face requirement is not "the *sine qua non* of the confrontation right[.]" *Craig*, at 847 (citation omitted). "The Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose testimonial infirmities such as forgetfulness, confusion, or evasion through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony." Id. (cleaned up).

In this case, the trial transcript supports Banks's contention that the closet replica blocked Banks's view of Officer Guin as he testified from the witness stand on direct examination. Assuming without deciding that the placement of the closet replica violated Banks's rights under the Confrontation Clause to confront the witness "face to face," the question remains whether, under the circumstances here, any such violation requires reversal. For the following reasons, we conclude that it does not.

> Although an admission of evidence in violation of the Confrontation Clause is error of constitutional magnitude, it can be harmless error if the State can prove beyond a reasonable doubt that the error did not contribute to the verdict, such as when the evidence at issue is cumulative of other properly-admitted evidence or when the evidence against the defendant is overwhelming.

*McCord v. State*, 305 Ga. 318, 321 (2019) (quotation marks omitted).

The circumstances of this case are unusual because it is clear from the record that the testifying witness, Officer Guin, was not obscured from Banks's view during the entirety of his

16

testimony. The officer was visible to the defendants during cross-examination, as the replica had been disassembled and removed from the courtroom prior to the officer being questioned by each of the defendants. Counsel for each of the defendants examined Officer Guin, and he testified, in addition to other matters, about what he observed when he found Williams inside her bedroom closet. Having reviewed that testimony from the record, we conclude that the State met its burden of showing beyond a reasonable doubt that this violation made no difference to the verdict because defense counsel was able to move around the replica and observe the witness. And although Banks could not see the witness during direct examination, he could still hear the witness testifying such that he could still confer with counsel about the subject matter of the direct examination, if he desired. Moreover, when Banks cross-examined the officer, the replica had been removed. Therefore, the record shows beyond a reasonable doubt that any violation of Banks's Confrontation Clause right to see Officer Guin as he testified on direct examination did not contribute to the verdict and, therefore, constituted harmless error. Id. at 324.

5. Banks contends that the trial court abused its discretion in not declaring a mistrial with respect to the State's use of the closet replica because it inhibited defense counsel from hearing the evidence, moving around the courtroom, observing and making eye contact with the jurors, and confronting and examining the witnesses. Banks, however, did not move for a mistrial on the grounds he now alleges in his appellate brief. Instead, his counsel moved for a mistrial on the basis that, while defense counsel had been free to move about the courtroom during the use of the closet replica, Banks himself was required to remain seated and was unable "to see" the testimony. Counsel argued that requiring Banks to remain seated while counsel was

17

free to move around the replica could have given the jurors the impression that Banks and the other defendants were in custody. Because Banks did not make a contemporaneous motion for a mistrial on the ground he now raises at the time he became aware of the matter giving rise to this claim of alleged error, he has waived review of this claim on appeal. See, e.g., *Jones v. State*, 317 Ga. 466, 472 (2023) ("In order to preserve an objection for ordinary appellate review, the specific ground of the objection must be made at the time the challenged evidence is offered." (cleaned up)); *Hightower v. State*, 287 Ga. 586, 590 n.4 (2010) (explaining that, although appellant preserved his claim of error on appeal as to the basis of his motion for mistrial, he raised no objection regarding a different issue and that issue is therefore not preserved for appeal).

6. Banks contends that the trial court abused its discretion in denying a mistrial "because a witness continued to testify about criminal acts committed by someone driving a red car, that was not identified but attempted to link these incidents to Defendant Banks as he was reported to be driving a red car during this incident."

With respect to the red and blue cars that Link observed in the neighborhood on the day of the crimes, he testified that he "called Fulton County to have the tags run because, again, I had reports on a vehicle that matched that from other residence[s] that were involved." Banks interrupted Link's testimony and moved for a mistrial on the ground that Link "brought out yet more incidents that are allegedly involving the red [car] and blue car[, i.e., specifically incidents of prior bad acts] … which impermissibly place[d] his character in issue because [Banks] is supposedly the driver of the red car." Outside the presence of the jury, the State explained that the other incidents were not

18

connected to Banks, and the State did not expect Link to testify about the other incidents involving those vehicles. The court denied the motion and, before the jury was called back into the courtroom, the prosecutor instructed Link that he was "not to talk about other crimes for which the red [car] and the blue car might be associated with that you know about."

The trial court did not abuse its discretion in denying this motion. See *Thomas v. State*, 311 Ga. 573, 576 (2021) ("A trial court generally has broad discretion in deciding whether to grant a mistrial, and great deference is afforded to a court's determination that a mistrial was not necessary." (quotation marks omitted)). Banks's objection cut Link's testimony short, and he did not discuss any specific prior criminal incidents involving the two cars. Even assuming there was an implication concerning Banks's involvement in prior crimes, it was a brief and passing reference. Cf. *Richardson v. State*, 308 Ga. 70, 71 (2020) ("[A] passing reference to a defendant's incarceration does not place his character in evidence." (cleaned up)). For these reasons, Banks has not shown that the trial court abused its discretion in denying his motion for a mistrial.

7. Banks also contends that the trial court abused its discretion in denying his motion for a mistrial with respect to Link continuing "to allude to other bad acts for which" the defense had no notice and which "negatively impacted [Banks's] character." Banks's trial attorney again moved for a mistrial the day after Link testified that he told the police that he had seen certain cars associated with "negative activities" in the subdivision on the day of the shooting. The trial court denied the motion but agreed to give curative instructions. The court drafted a curative instruction with input from defense counsel. The court instructed the jury: "I want you to completely disregard the

witness's testimony about other negative activities. So you are to disregard that testimony." Thereafter, Banks did not renew his motion for a mistrial. Consequently, this claim of error has been waived. See *Hartsfield v. State*, 294 Ga. 883, 886 (2014) (concluding appellate review was waived when a renewed motion for mistrial was not made after the trial court gave a curative instruction).

8. Banks argues that the trial court should have granted a mistrial when Banks's mother, Sheryl Collins, made a reference to Banks being incarcerated. On direct examination, Collins testified that she had a limited relationship with Banks. When the prosecutor asked why, she responded, "He's incarcerated." Banks, along with his co-defendants, moved for a mistrial. The trial court denied the motion and told the jury: "I'm going to ask you to disregard that last response. It was non-responsive to the question." Banks did not renew his motion for a mistrial. Consequently, this claim of error has not been preserved for appellate review. See *Hartsfield*, 284 Ga. at 886.

9. Banks contends that the trial court abused its discretion in denying his motion for a mistrial or for curative instructions following emotional outbursts from the courtroom observers. During one of the trial days, there were several emotional outbursts from the audience. One occurred during codefendant Calhoun's cross-examination of Burke. Thereafter, Banks moved for a mistrial outside the presence of the jury. Banks argued that the outbursts were prejudicial to the jury such that a mistrial was proper, or, in the alternative, asked that the court admonish the audience to hold their emotions in check. The trial court chose to admonish the audience instead of granting the motion for mistrial. Calhoun then asked for curative instructions for the jury, and the court gave them. No defendant thereafter objected

20

or renewed their motion for a mistrial. Therefore, this claim has not been preserved for appellate review. See *Hartsfield*, 294 Ga. at 886.

10. Banks contends that the trial court erred in sentencing him to "discretionary life without parole based on the evidence" for the offense of malice murder in violation of the Eighth Amendment to the United States Constitution. He contends that the sentence was cruel, disproportionate to the crime committed, and that it "shocks the conscience." We disagree.

On August 12, 2016, the State filed a notice in aggravation and intent to seek recidivist punishment under OCGA §17-10-7(a), listing Banks's prior felony convictions. At sentencing, the prosecutor requested that Banks be sentenced to life without the possibility of parole for murder. She informed the court the sentence was not mandatory and that the court had the discretion to sentence him to life with or without the possibility of parole. The court heard argument from counsel and heard comments from members of the community in support of both Banks and the victim, and Banks made a statement. Ultimately, the court sentenced Banks to life without the possibility of parole for malice murder, which was authorized under OCGA § 17-10-7(a)[7] and §

---

[7] OCGA § 17-10-7(a) provides:

Except as otherwise provided in subsection (b) or (b.1) of this Code section, any person who, after having been convicted of a felony offense in this state or having been convicted under the laws of any other state or of the United States of a crime which if committed within this state would be a felony and sentenced to confinement in a penal institution, commits a felony punishable by confinement in a penal institution shall be sentenced to undergo the longest period of time prescribed for the punishment of the subsequent offense of which he or she

16-5-1(e)(1).[8]

Because Banks's sentence fell within the statutory limits enacted by the legislature for malice murder, it does not violate the Eighth Amendment's prohibition against cruel and unusual punishments[9] unless Banks can show that the sentence "shocks the conscience" or is grossly disproportionate to the offense committed. As we have explained, "[l]egislative enactments constitute the clearest and most objective evidence of how contemporary society views a particular punishment. Legislative discretion must be deferred to unless, under the circumstances, the sentence shocks the conscience." *Graham v. State*, 266 Ga. 543, 544 (1996) (cleaned up). Banks has not presented any evidence or argument showing that his sentence "shocks the conscience" or was grossly disproportionate to sentences imposed in similar cases in Georgia or other jurisdictions, nor do we discern any such evidence in the record before us. Instead, the evidence in this case demonstrated that Banks, a repeat offender and member of a burglary crew, executed Williams by pressing a gun to her forehead and pulling the trigger after finding her hiding in her closet during the burglary of her home. Under these circumstances, Banks's sentence does not "shock the conscience" and therefore fails to raise an inference of gross

---

stands convicted, provided that, unless otherwise provided by law, the trial judge may, in his or her discretion, probate or suspend the maximum sentence prescribed for the offense.

[8] OCGA § 16-5-1(e)(1) provides: "A person convicted of the offense of murder shall be punished by death, by imprisonment for life without parole, or by imprisonment for life."

[9] "The Eighth Amendment of the United States Constitution bans 'cruel and unusual punishments,' including those that are grossly disproportionate to the crime committed." *Sillah v. State*, 315 Ga. 741, 754 (2023).

22

disproportionality. See *Sellers v. State*, 323 Ga. 237, 246 (2026) (explaining that appellant's sentence of life without parole for malice murder was not grossly disproportionate where evidence showed he broke into the victim's motel room, beat him, and shot him in the back when he tried to flee) For these reasons, we affirm Banks's sentence.

11. Banks contends that his counsel provided constitutionally ineffective assistance when, without objection, he allowed witness Greer to read into the record that he was given immunity for his "truthful testimony," thereby impermissibly bolstering his testimony.

This ground for relief was not preserved for appellate review by Banks.[10] After trial, Banks retained new counsel to represent him and to file a motion for new trial. New counsel did not raise this claim of ineffective assistance in Banks's amended motion for new trial, nor did he argue it at the motion for new trial hearing. The trial court did not address any ineffective assistance claims in the order denying Banks' motion for new trial, as no such claims had been placed before the trial court for decision. "To preserve the issue of ineffective assistance of previous counsel, new counsel must raise the issue at the earliest practicable opportunity of post-conviction review or the issue is waived." *McIntyre v. State*, 312 Ga. 531, 536 (2021) (citation omitted). Because Banks did not raise this claims in his motion for new trial, the claim is not preserved for appellate review. See id.

*Judgment affirmed. All the Justices concur.*

---

[10] The claim of error was raised by co-defendant Sims in his motion for new trial and the trial court denied this claim as to Sims only.